62 U.S. 527 (1858)
21 How. 527
JOHN W. BRITTAN, APPELLANT,
v.
WILLIAM A. BARNABY, CLAIMANT OF THE SHIP ALBONI.
Supreme Court of United States.

*529 It was argued by Mr. Sherwood for the appellant, and Mr. Broom for the appellee.
*531 Mr. Justice WAYNE delivered the opinion of the court.
This cause involves an important commercial principle, of daily recurrence in practice, which does not appear to be well understood and settled in San Francisco. Our decision will correct the misapprehension there in regard to the delivery of merchandise by ship-owners, and the payment of freight for its transportation.
The libellant was the owner and consignee of goods of a value exceeding four thousand dollars, which were shipped in good order and condition at New York, on board of the ship Alboni, to be carried and delivered in San Francisco, in the same order, at a rate of freight expressed in the bill of lading. It amounted to two hundred and forty-seven dollars and twelve cents, including eleven dollars and seventy-seven cents for primage. The bill of lading, upon its face, is in the ordinary form; but there was a stamp upon the back of it, in these words: "That the goods were to be delivered at the ship's tackles when ready for delivery  not accountable for loss or damage by fire or collision; freight payable prior to delivery, if required; contents unknown." The proctors in the cause agreed that those words were stamped on the original bill of lading.
The ship arrived at San Francisco. Notice of it was given to the libellant by the consignee of the ship; and he also required payment of the freight of the goods as they should be landed from the ship on the wharf, and that if it was not paid, and the goods received by four o'clock of the day, such of them as had been landed would be placed in a warehouse for safe keeping, at the expense of the libellant. The notice and the requirement are taken from the second article of the respondent's answer to the libel. He adds, that the libellant had refused to pay the freight according to the terms of the bill of lading.
The testimony discloses what the respondent considered to be its terms, and the refusal of the libellant to acquiesce in his interpretation.
*532 The goods were landed from the ship in parcels, on different days, from the 24th to the 27th of October, inclusive. The clerk of the libellant attended on each day to receive them. In conformity to the notice which had been given, he offered to pay the freight of such of the merchandise as had been landed. The consignee of the ship refused to receive it, or to deliver such goods, claiming that he had a right to demand the freight upon the whole shipment, when he was only ready to deliver a part of it. In the assertion of this right (certainly not in conformity with the notice he had given to the libellant) the respondent from day to day warehoused the goods.
The libellant did all he was bound to do under the notice which had been given to him. He could not have done more. The respondent's refusal to deliver the parcels as they were landed cannot be justified, under the notice he had given, by any delay there may have been in the delivery, either from the necessity of weighing or measuring them, or from the claim made by him to have the freight paid upon the whole shipment before he would deliver a part of it. He had taken his course, and the libellant acquiesced in it, by offering to pay the freight on each parcel as it was put on the wharf, though not bound to do so by the commercial law. The respondent's refusal has no justification, either in law, nor can it be vindicated by any evidence in the cause.
We do not mean to say that the libellant had a right to take the parcels on the days they were landed, without the payment of a pro rata freight; but where a ship-master has a larger shipment under one bill of lading than he can land in the business hours of a day, as he has the control of unloading the cargo, he must take care not to do it in such quantities that he may not be able to have the pro rata freight ascertained in the only way in which it can be done. Until it shall be done, he is not in readiness to deliver such part, or to demand the freight which may be due upon it. Goods so landed will be under his care and responsibility, without additional expense to the consignee of them, until they shall be ready for delivery.
Ordinarily, no difficulty arises between the ship's owner and *533 the consignee of the goods; their interest, convenience, and responsibilities, usually suggest to them some arrangement for the freight beforehand, by which goods landed from day to day may be taken without delay by the consignee of them. In this instance, however, no opportunity was given to the libellant to make such an arrangement, the consignee of the ship having absolutely demanded the whole freight of the shipment as the condition for the delivery of any part of it.
On the fourth day, when all of the libellant's shipment had been landed, and before they were sent to a warehouse, he demanded from the consignee of the ship a delivery order for all the merchandise specified in the bill of lading, tendering at the same time, in gold, the whole freight due. The delivery order was refused, the answer being that the goods were subject, in addition to the freight, to a charge for storage and cartage. The last was also warehoused by the respondent, as those of the three previous landings had been.
The foregoing is a sufficient statement of the facts and evidence in this case for the decision of it. It will not be necessary to notice again the attendance of the clerk of the libellant on the days of landing, to receive the goods and pay the freight.
The word freight, when not used in a sense to imply the burden or loading of the ship, or the cargo which she has on board, is the hire agreed upon between the owner or master for the carriage of goods from one port or place to another. That hire, without a different stipulation by the parties, is only payable when the merchandise is in readiness to be delivered to the person having the right to receive it. Then the freight must be paid before an actual delivery can be called for. In other words, the rule is, in the absence of any agreement to the contrary of it, that freight, under an ordinary bill of lading, is only demandable by the owner, master, or consignee of the ship, when they are ready to deliver the goods in the like good order as they were when they were received on board of the ship. Such is the general rule. Neither party can require from the other that the merchandise shipped under one bill of lading shall be put up into parcels for delivery, or for the payment of freight. They may do so by stipulation in the bill of lading, *534 or by subsequent agreement, for either of the purpose just mentioned. The master is bound to deliver the goods in a reasonable time. What may be so, depends upon the facilities there may be for the discharge of the cargo at the port of delivery, and the impediments in the way of it. When the shipment is large, or, from the master's storage of it, it cannot be landed in a day, if he lands a part of it, his lien upon the whole gives him the power to ask from the consignee of the merchandise a satisfactory security for the payment of the entire freight as called for by the bill of lading. But a security or arrangement is all that he can ask. He may not demand that the whole freight of the shipment should be paid before the consignee has had the opportunity to examine his goods, to see if the obligations of the bill of lading have been fulfilled by the ship-owner. Nor is the ship bound to land an entire shipment in a day, for the proper storage of the goods is the master's care, and he may do it in such a way as may be most advantageous to the ship, taking care that it shall not be done to the injury of the goods, or in such a manner as to produce unreasonable delay in the delivery of them. And when landings of the same shipment are made on different days, if the shipper disregards the notice given to him that such will be the case, and he shall not be present to receive the goods, and has not made an arrangement to secure the payment of the freight, they may be stored for safe keeping at the consignee's expense and risk, in the ship-owner's name, to preserve his lien for the freight. This course was not pursued in this case by the consignee of the ship. He attempts to justify what he did upon the allegation in his answer to the libel, that the bill of lading contained a stipulation, that the freight to be earned on the whole shipment was payable when a portion of it had been landed.
The bill of lading, upon the face of it, is the ordinary one between parties for the transportation of merchandise. The merchandise mentioned in it was to be carried from New York to San Francisco at fixed rates for freight, with primage and average accustomed. There is no other stipulation or condition in it than the undertaking for carrying the goods, and *535 that of the shipper to pay the freight. But the consignee of the ship claimed that the stamp upon the back of the bill of lading was equivalent to one. So his counsel contended in argument. This stamp was in red ink, and was put on the bill of lading by the ship's owner. We will suppose it had been made by Captain Barnaby before he signed the bill of lading. But it was not signed by the parties, nor is there any proof that it was ever recognised by the shipper as a part of his contract. Nothing seems to have been said about it when the bill of lading was signed, nor until it was claimed in San Francisco to be a part of it. It no doubt has a relation to the subject-matter of the bill of lading, and was put there by Captain Barnaby for that purpose; but unless it received the assent of the shipper, it cannot vary the obligations of the contract so as to authorize a demand for freight before the goods were ready for delivery. The question we are now considering is not what effect might be given to such a stamp upon a bill of lading by proof that the parties, at the time it was made, adopted it as a stipulation or agreement that the shipper was to pay the whole freight upon his shipment when a portion of it had been landed from the ship; but the question is, whether such a stamp, of itself, upon a bill of lading, can change the well-known commercial rule in respect to the delivery of goods and the payment of freight. It is that which is asked in this case by the respondent. There is not a word of proof that the shippers in New York, or the consignee in San Francisco, ever regarded it in such a light; none that Captain Barnaby considered the stamp to be a part of the bill of lading assented to by the shipper, until it was asserted by him to be so, in his answer, after the consignee of the ship had attempted to enforce it, as a part of the contract, upon the libellant. It was properly resisted. The personal obligation to pay freight rests upon a bill of lading, when one has been given, and the payment of it is made a condition of delivery. The general rule is, that the delivery of the goods at the place of destination, according to the bill of lading, is necessary to entitle the ship to freight. The conveyance and delivery is a condition precedent, and must be fulfilled. (3 Kent, 218.)
*536 Such a stamp cannot be considered a stipulation, according to the legal meaning of that word. All writers upon commercial law use the word stipulation to denote a particular engagement, which may be insisted upon, before it can control the general operation of law, or vary a contract. Such stipulations are not uncommon between ship-owners and shippers of merchandise, in charter-parties and in bills of lading. But when done in either, they must be made in words sufficiently intelligible to indicate an agreement that the operation of the law merchant, in respect to those instruments, is not to prevail; and the stipulation must be in writing, and be signed by the parties, before it can be received as an auxiliary to explain how the contract is to be performed. A memorandum or stamp upon the back of a bill of lading is insufficient for such a purpose, though the ship-owner may have made it as an intimation of his mode of doing business, or that a practice prevailed in conformity with it at the port to which the goods were to be carried and delivered to a consignee. An attempt was made to assimilate the stamp in this case to a memorandum on a policy of insurance. In the first place, as loose, indefinite, and dangerous, as some of the decisions in the English and American reports are, concerning memorandums of that kind, no case can be found in either, in which effect has been given to any memorandum which was not on the face or in the margin of the policy. But if such a case can be found, we should not feel ourselves at liberty to extend it to a bill of lading for the transportation of merchandise.
Those instruments of commerce are construed by very different principles and usages. The cases cited by counsel to show that the memorandums upon the face of the one were analogous to a stamp put upon a bill of lading, do not apply. Neither do the texts from Duer, 75, 141, do so. The rule in respect to policies of insurance is, that it is not material whether the written words of a policy are inserted in the body of the instrument, or written on its face or on the margin of it; but they must be there in fact; must have been written before the execution of it, or by mutual consent after the execution, and before the commencement of the risk. Thus they *537 then form parts of the contract, it having been determined, from the usages of insurances, that the parties contracted in reference to them, and that the signature and acceptance of the policy was proof that they had done so. All of the other cases cited are agreements, varying, in some particulars, the payment of notes of hand, entered into contemporaneously with the execution of the notes, and which, by proofs, were shown to have been meant by the parties to be a part of them. An attempt was also made to show that a practice prevailed in San Francisco which gave an effect to the stamp upon the bill of lading, so as to control the general rules of commercial law in respect to the payment of freight, and the delivery of merchandise from ships. Whatever may be the practice there, or however general it may be, it is too recent in its use to make an exception, on the ground that it was a custom. The trade of San Francisco is already large; every day develops its resources and the advantages of its position for commerce. No doubt it has not as yet those facilities for the landing of merchandise and loading of ships which our older ports have; but that will not give to any practice there, however general it may have become, the force of custom to release its merchants from the obligation of an ordinary bill of lading. If inconveniences exist in the particular just mentioned, it will be best for the merchants of San Francisco, and those with whom they deal in other parts of the world, that the contract of a bill of lading should have its fixed meaning and obligation, and that it is only alterable by express stipulations made in the way which has been already stated in the decision.
The testimony, however, in this case shows a very uncertain opinion and a fluctuating practice in San Francisco upon the subject of the delivery of shipments of goods and the payment of freight; that such a demand as was made upon the libellant to pay his freight upon all the merchandise mentioned in his bill of lading, when only a portion of it had been landed upon the wharf, had only been acquiesced in by many of the merchants there to avoid trouble, to get early possession of their importations, and from an unwillingness to be troubled with lawsuits. There are also differences of opinion as to the efficacy *538 of such a stamp as there was upon the bill of lading in this case, many of them, from their experience and knowledge of trade elsewhere, having a more correct apprehension of the commercial law than the reverse of it, which was attempted to be imposed upon the libellant. Nor can any previous assent to the usage of a particular firm engaged in the shipping business, though acquiesced in by one who had had other dealings with it, be interpreted into an agreement so as to deprive him of a right under an ordinary bill of lading subsequently made.
The view which we have given of this case determines the whole controversy. It comprehends every point raised by the record, or made in the argument of it. The respondent having in the first instance demanded the entire freight called for by the bill of lading, without any right to do so, and having refused to deliver the merchandise belonging to the libellant when the last parcel of it was landed on the wharf, and when the freight due upon the whole of it was tendered, on the ground that there were due charges for cartage and storage, did so without color of law for such refusal. Our judgment is, that those charges must be paid by the respondent, and we shall reverse the decision of the court below, and direct a mandate to be sent to the Circuit Court to order a decree for the libellant for the sum of four thousand three hundred and sixty-seven dollars forty-five cents, with interest from the 2d day of November, 1855. (9th vol. Stat. at L., 181.)
The sum mentioned is proved to have been the value of the libellant's merchandise after freight and primage had been deducted, when it was wrongfully detained by the respondent. The respondent will also be charged with the costs which have been incurred in the prosecution of this libel.
Mr. Justice DANIEL dissents to the decision in this case, upon the grounds that the court of admiralty in this country, as in England, can take no cognizance of charter-parties or bills of lading, and because this case was within the plain jurisdiction of the courts of the State of California, either at common law or in equity.