## THE SUFFOLK.

### GOLDSMITH *v*. THE SUFFOLK.

#### (*District Court, D. Maryland.* February 23, 1887.)

**1. DAMAGES—WRONGFUL DETENTION OF CATTLE—FALL IN PRICE.**

During a wrongful detention of a shipment of cattle by ship-owners, to compel the payment of an unfounded claim for one day's demurrage, the market price declined. *Held*, that the ship-owners were liable for the loss in the price of the cattle.[1]

**2. SAME—KEEPING DOWN THE DAMAGES.**

The owner of the cattle tendered the freight, but refused to pay the demurrage, the amount of which was trifling compared with the value of the whole 367 head of cattle detained. The ship-owners detained the whole shipment, against the demand of the whole by the owner, and did not offer to deliver any, although two or three of the animals would have been ample to have secured the demurrage claimed. *Held* that, if the ship-owners would have been willing to deliver all but two or three of the cattle, the offer should have come from them, but that, having detained the whole without an offer to deliver any, and their claim for demurrage having proved to be unfounded, they were liable for the loss occasioned by the detention, and could not now be heard to say that the owners of the cattle might have made the loss less by offering to leave two or three animals as security, or by paying the demurrage under protest.

(*Syllabus by the Court.*)

In Admiralty.

*Sebastian Brown* and *Henry M. Rogers,* for libelant.

*John H. Thomas*, for respondent.

MORRIS, J. The libelant seeks to recover for a loss on 370 head of cattle shipped by him from Philadelphia to London, on board the Brit-

---

[1] The measure of damages is the difference between the market value of the goods at the place of destination when they ought to have been delivered and their market value when they were delivered. In re Petersen, 21 Fed. Rep. 885; The Golden Rule, 9 Fed. Rep. 334; Railway Co. v. Mudford, (Ark.) 3 S. W. Rep. 814; Railroad Co. v. Hale, (Tenn.) 1 S. W. Rep. 620. If the benefit of a sale which had been made of the goods to arrive is lost, the measure of damages is the difference between the price at which such sale was made and the market price at the time of the actual delivery. Schmidt v. The Pennsylvania, 4 Fed. Rep. 548.

ish steam-ship Suffolk, alleged to have been caused by the wrongful refusal of the ship-owners to deliver the cattle in London; and he also seeks to recover back £65 paid by him as demurrage, under protest, in order to obtain possession of the animals. The steam-ship arrived at the Deptford cattle wharf early on the fifteenth April, 1885, and on that day the London agents of libelant tendered the freight, and demanded the cattle; but delivery was refused unless £65 for one day's demurrage at the port of Philadelphia was also paid. Libelant's agents, having no instructions to pay demurrage, declined to pay it, and the cattle were detained by the ship-owners until the 18th, when, having received cable authority from the libelant, his agents paid the sum demanded under protest. The first market day for cattle after the ship's arrival was the 16th, and that market was lost by the detention. The next market-day was the 20th, on which day the animals were sold at a serious decline from the price which prevailed on the first market-day.

The first and fundamental question is whether the libelant had rendered himself liable to the charge for demurrage, which the live-stock contract provided should be payable by the party in default at the rate of £65 per day. This contract provided that the steamer should give six clear days' notice of her readiness to receive the animals. Notice was given to libelant by Messrs. Peter Wright & Sons, the ship's agents in Philadelphia, on March 21, 1885, that the steamer would be ready on Saturday, March 28th, and that she would require 437 head. The libelant replied on twenty-fourth March that the number required was in excess of what the ship could properly carry; that he would not ship more than 286; that he would agree to ship that number if the ship's agents would agree to receive them; otherwise he would stand strictly on his contract. The contract stipulated that the libelant had engaged all the space on the spar and main deck at 55 shillings per head, and that the space for each animal should be not less than 8 feet by 2 feet 8 inches, and in addition ample space for feeding and watering, and that the alley-ways and hatches were not to be obstructed, and that the stalls were to be constructed at the ship's expense, to the satisfaction of the inspector of the underwriters interested.

The ship's agents continued to claim that the steamer could properly be fitted for at least 435 head, and warned libelant that he would be held responsible for freight upon that number. The fittings were not completed and inspected until about 1 o'clock on Saturday, when the underwriters' inspector notified libelant that the steamer could properly carry, under the terms of the contract, 367 head. Libelant was ready with his cattle at the Philadelphia stock-yards, located about three miles from Girard Point, where the ship was lying, and where the cattle were to be put on board; but he refused to load any at all unless the ship's agents would accept 367 as a fulfillment of the contract. Thereupon the ship's agents sent a Mr. Nelson, a gentleman in their employ, who attended to such business for them, out to the stock-yards to see libelant. During the afternoon of Saturday, after frequent communication with the ship's agents by telephone, Mr. Nelson and libelant came to

an understanding and agreement. It was that libelant should ship, and the steamer should accept as performance of the contract as to the number of cattle 370 head, and that they should be sent to the ship the next morning, which would be Sunday.

The controversy giving rise to this litigation begins just here. Mr. Nelson claims that it was part of the agreement that libelant should get the cattle on board Sunday morning in time for the steamer to get out from the wharf before high tide, so that she could proceed on her voyage on that day. Libelant claims that in the agreement made between Nelson and himself it was understood that neither party was to be chargeable for any delay during the negotiations on Saturday afternoon, and that he was to get the cattle to the ship before 10 o'clock Sunday. Mr. Nelson testifies that libelant raised a question about who was to pay his feed-bill for keeping the cattle at the stock-yard over Saturday night, and that he (Nelson) replied: "We have a demurrage claim for one day against you, but if you say nothing about your feed-bill, and send the cattle so that the ship can leave Girard Point before noon to-morrow, we will throw off the demurrage." Libelant, however, testifies that when he spoke about the feed-bill for keeping the cattle over night, Nelson objected to it, and libelant consented to let that go, and that all he agreed to was to have the cattle down in the morning between 9 and 10 o'clock.

During the night there was a heavy fall of snow, and the morning of Sunday was stormy. The cattle were got out of the cattle-yards into the cars between 6 and 7 o'clock, and the train, consisting of 21 cars, arrived at the ship's wharf at 10 minutes past 8 o'clock. There then ensued a delay of at least an hour before putting the cattle on board was begun. There is quite a conflict of testimony as to what caused this delay, but I think the preponderance of testimony shows that it was mainly to enable the carpenters employed by the ship to rig up the gangway from the railroad track across the wharf to the ship's side, and another necessary gangway on the ship from the upper to the lower deck. When the fore-part of the ship was loaded with cattle, it was necessary to move the gangway to the after-part of the ship, and this again consumed a good portion of an hour. Something more than the time usually required for loading was consumed in placing the cattle on board, from the fact that the steamer had more separate compartments than regular cattle steamers, and cattle were selected out as being better fitted for special locations. From all these causes combined, it resulted that the cattle were not all on board until 2 o'clock, and the latest hour at which the vessel could have been moved from the wharf into the stream was half past 11.

The freight contract provided that the steamer should provide suitable gangways and elevators for loading the animals, so that the steamer was responsible for any delay attributable to tardiness in having the gangways ready.

It is contended on behalf of the steamer that the testimony shows that there was no delay attributable to that cause. On the other hand, I can find no convincing testimony to show that, after the cattle arrived at the

wharf at 10 minutes past 8, there was want of diligence or skill on the part of the cattle-men in their efforts to get the cattle on board. The libelant himself was on the wharf, the cattle-men came on the train with the cattle, the weather was inclement, everybody seems to have been anxious to get through, and no special complaint was made by the ship's officers at the time. If it be true that the gangways were suitable and ready when the cattle arrived, it would then appear that six hours was only a reasonable time in which to load 370 cattle on that steamer. If this is so, then, as half past 11 was the latest that the ship could be moved, it would have required the cattle to be at the wharf at 5 o'clock in the morning; and, as the underwriters require cattle to be loaded by daylight, they could hardly have begun putting them aboard before 6 o'clock. To have got the cattle to the wharf at 5 o'clock would have required the loading into the 21 cars at the stock-yard to have been begun at 3 o'clock. There is nothing that leads to the conclusion that there was any exigency of this sort in the minds of Nelson and libelant when they thought they had settled all questions between them on Saturday afternoon at 6 o'clock.

It is conceded by the testimony of Mr. Nelson that the delay caused by the dispute on Saturday was condoned on both sides, and that, in consideration of libelant agreeing to ship 370 head of cattle, which was 3 more than he contended under the inspector's certificate he was required by his contract to send, no claim for demurrage based upon that delay was to be insisted on. Indeed, if the cattle had been delivered on Saturday, as required by the notice, the steamer could not have been moved Saturday night, and not until just before noon on Sunday on account of the tide; so that by reason of anything that had occurred up to Saturday evening the steamer had lost no time. Undoubtedly it was the expectation of both Nelson and libelant that the steamer would be able to get away on Sunday, but it seems to me, under the understanding which was arrived at on Saturday, that in order to charge libelant because the steamer did not get away it must be shown that it was because of some fault on his part.

The libelant testifies that at the conclusion of the negotiation with Nelson which resulted in the agreement between them, he asked to have it put in writing. But Nelson said it was all right, his word was good enough, and this conversation is testified to by others also. Now, it does seem highly probable that if Nelson then considered that libelant had bound himself to have the cattle on board by half past 11 o'clock, or forfeit over $300 demurrage, he would have been more anxious to have that part of the agreement put in writing than the libelant to have the number of cattle put beyond dispute, when he already, with regard to that matter, had the protection of inspector's certificate. It is conceded, too, that nothing was said by either party about the hour at which the tide would serve to get the steamer out, although Mr. Nelson says he knew what the hour was.

The cattle having been put aboard by 2 o'clock on Sunday, the libelant received the captain's receipt for them, containing no claim for de-

murrage, and no intimation that such a claim was contemplated; and on the following Monday applied to the ship's agents for the usual bills of lading, tendering the freight, which by the contract was payable in advance. The agents refused the bills of lading unless libelant would pay, in addition to the freight, about $100 for the extra wages of the stevedores and carpenters for working on Sunday, and also £65 for one day's demurrage. They afterwards were willing to give the bills of lading upon the payment of the £65, without the extra wages, or to give the bills of lading with the claim for £65 indorsed on them. This the libelant refused to accede to, and sent forward the captain's receipt to his London agents.

Upon the whole evidence, my conclusion is that it is proved that, by the agreement of Saturday afternoon, the delay during the dispute of Saturday was condoned, and that the alleged agreement that libelant should be liable for demurrage unless the steamer got away on Sunday, whether by the fault of libelant or not, has not been established. In my judgment, it results that the claim to detain the cattle until £65, in addition to the freight, was paid, was wrongful, and that the ship is liable for the loss in the market price of the cattle resulting from that detention. *Brittan* v. *Barnaby*, 21 How. 527.

It is urged that libelant might have lessened the loss if he had offered to allow two or three of the animals to remain as security for the sum claimed as demurrage, and had accepted delivery of the others. But the ship-owners had a right to exercise their judgment as to what portion of the shipment they would detain as security to protect any just claim of demurrage they had, and, if they would have been satisfied with less than the whole shipment, they should have suggested it. They were fully advised by their Philadelphia agents of the whole difficulty out of which the delay had arisen, and that libelant earnestly disputed the demurrage, and that he had repeatedly refused the bills of lading unless clean of any such claim. They did not offer to deliver any part of the shipment, but stood upon a very vigorous exercise of a supposed legal right, detaining against the demand and protest of the owner a shipment of cattle worth about $40,000, as security for a disputed claim of $325.

I will sign a decree for the £65 paid under protest, and for the amount of loss on the sale of the cattle resulting from the decline in the market price between the first and second market-days after the arrival of the cattle.