Verdict for plaintiffs.

---

HENDERSON *et al. v.* THREE HUNDRED TONS OF IRON ORE.[1]

MARVEL *v.* THE SCANDINAVIA.

*(District Court, S. D. New York.* February 5, 1889.)

1. SHIPPING—LIBEL FOR FREIGHT—DAMAGES FOR DETENTION—WHEN ACCRUES.
   The steam-ship S. arrived at New York with iron ore. The bill of lading receipted for 300 tons, "weight unknown," to be delivered to the libelant M., freight payable on amount delivered. It was unladen into libelant's lighter along-side, and weighed in transit by a custom-house weigher. This weight could only be obtained at the custom-house after the returns were filed. There is no settled custom here as to payment of freight before or during discharge. Before discharge notice was sent to the consignee, requiring payment of freight before delivery. He replied that he would pay when the weight was ascertained. As soon as the ore was on the lighter, and before the exact weight was ascertainable, the vessel attached the ore for the freight; and on the next day a cross-libel was filed for damages for refusal to deliver, no tender having been made. *Held,* that both actions were prematurely brought, and that the libelant should pay all costs and expenses incident to the premature filing of the original libel.

2. SAME—ADMIRALTY—PLEADING—SUPPLEMENTAL COMPLAINT.
   A libel fatally defective cannot be sustained through a supplemental bill setting up matters subsequent; but a supplemental libel may, for cause, be allowed to stand as an original libel as of that date.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

**3.** SAME—REFUSAL TO DELIVER CARGO—CONVERSION.

    The supplemental cross-libel set up a proper tender made after the weight was ascertained, and the vessel's refusal to deliver. *Held,* that such refusal was not evidence of any conversion of the ore, and would not sustain an action of trover, or any cross-libel, as the ore was at the time in the custody of the law, in a court of competent jurisdiction, and in a *bona fide* suit brought without malice in the prosecution of the ordinary right of suit; and that the consignee's remedy was in the original suit only.

**4.** SAME—SALE OF CARGO PENDENTE LITE—DAMAGES ON ATTACHMENT.

    Iron ore attached was ordered sold as "perishable" on account of the heavy charges for keeping it. It brought less than the market value, and the consignee claimed the loss as damages in his cross-libel. He had full knowledge of the attachment, the application to sell, and the sale. and could easily have bonded the goods, but chose not to do so. *Held,* that the action would not lie; that his remedy in admiralty was in the original suit only, under the rules that provide for bonding; and that no damages are recoverable either for the detention of the *res pendente lite,* nor for the sale by order of the court *pendente lite,* under such circumstances. In general no damages are recoverable for detention under attachment, except as provided by statute.

**5.** SAME—DELIVERY OF CARGO—WEIGHING—BILL OF LADING.

    When a bill of lading states, "weight unknown," and freight is payable on amount delivered, the number of tons receipted for in the bill of lading is not *prima facie* evidence of the weight delivered, and weighing is the duty of the ship.

    In Admiralty. Libel for freight, and cross-libel for damage in vessel's refusal to deliver cargo.

    On April 26, 1882, the steam-ship Scandinavia arrived at this port with some iron ore, stated in the bill of lading to be "300 tons in bulk, to be delivered to the libelant William D. Marvel or assigns; freight being paid by the receiver at the rate of 11 shillings sterling per ton of 20 cwt. delivered, as per margin, with primage accustomed." Among the conditions of the bill of lading is "weight unknown." The discharge of the ore from the steamer into a canal-boat sent along-side by the consignee for the purpose of receiving the ore, was commenced on April 28th, and finished on the afternoon of May 4th. The weight was taken on the steamer's deck, during the discharge, by a custom-house weigher, (detailed there for the purpose of ascertaining duties,) in accordance with the long practice for ship and consignee to accept the weight as thus ascertained. The treasury regulations forbid the weight to be made known except through the custom-house, after the weigher's returns are filed. A bill for freight, as for 300 tons, as per bill of lading, was made out and sent to the consignee on May 2d. There is no settled or uniform custom in this port as respects payment of freight before or during the discharge. Some payments on account are usually made by the receiver; the ship's agents get all they can in advance, and the rest, after delivery; and there are often vexatious delays in securing payment of balances. This consignee's practice had been to pay upon presentment of the custom-house certificate of weight.

    On May 4th, shortly before the discharge into the canal-boat was completed, notice thereof was given to Mr. Marvel, and that the freight must be paid before the ore would be allowed to go; to which he replied: "Send bill up here, with weight, and get your money." In a letter of

same date he demanded certificate of weight to be sent him. The exact weight could not be obtained from the custom-house until May 6th, when it was found to be about 28 cwt. short of 300 tons. At about 4 o'clock P. M. of the 4th, after all the ore had been put into the canal-boat, Henderson Bros. caused the ore to be attached by the marshal upon a libel filed in this court on that day. On May 5th, the consignee filed the cross-libel, claiming $3,000 damages for an alleged willful and wrongful refusal to deliver the ore on request. On May 6th, Henderson Bros. sent Mr. Marvel a corrected bill, stating the true weight and amount of freight due, being $3.78 less than the former bill. On the 10th, a tender of the true freight was made by Marvel, and delivery of the ore demanded, which was refused without explanation; presumably on account of the two suits pending and the charges therein.

Mr. Marvel designed to send the ore to Jersey City; but when it was attached no tug was present to remove it; and the captain of the canal-boat testified that he was notified by Henderson's dock clerk not to take her away until the freight was settled, and that he agreed not to do so. The ore remained in the marshal's possession until sold by him as perishable under the order of this court dated May 23d, after due notice to the consignee and his proctors; the consignee having taken no steps to bond the ore as he might have done. It brought $1,230,—about $900 less than its value, as claimed by the consignee. Both parties were of abundant pecuniary responsibility, and of good standing.

*Wing, Shoudy & Putnam,* (*C. C. Burlingham,* of counsel,) for the steamer.
*Lee & Lee,* for the consignee.

BROWN, J., (*after stating the facts as above.*) This controversy has grown out of an attempt of Henderson Bros., in conjunction with the managers of other lines of Mediterranean steamers, to establish a regulation for the provisional payment of freight at their respective offices according to weights named in the bills of lading, before the actual delivery of the goods, leaving the correction of any errors therein to future adjustment, after the weight is ascertained; like the custom-house usage in the provisional and final liquidation of duties. A joint circular to this end was previously issued in December, 1881, which seems not to have reached Mr. Marvel.

When the payment of freight and delivery of the cargo, as a whole, are by the legal rule made concurrent acts, great practical difficulties arise, if the quantity is large, and each side stands on its legal rights. The amount may be so great that part of the cargo may have to be removed before the rest is discharged; and if the consignee refuses to pay *pro rata* freight on what is removable, or to give security for payment, the ship is not bound to deliver piecemeal, and may remove and store such parts as are necessary to be removed at the consignee's expense. *Brittan v. Barnaby,* 21 How. 527, 534; *The Kathleen Mary,* 8 Ben. 165, 170. See *The Tangier,* 32 Fed. Rep. 230.

1. The legal effect of the terms of this bill of lading was to make payment of freight and delivery of the goods concurrent. Although the bill

of lading reads, "Freight being paid on the cwt. delivered, as per margin," and the margin says, "300 tons," I cannot hold that the words "as per margin" qualify the previous restriction to the cwt. delivered, or that they even make the 300 tons named in the margin any such *prima facie* evidence of the freight due as to warrant the ship in holding the ore for that amount, without taking any steps to ascertain how many cwt. were delivered. Under the clause "weight unknown," the statement of "300 tons," in the bill of lading, was not even *prima facie* evidence as to the weight against the ship, when it appeared that all received was delivered. *The Ismaele,* 14 Fed. Rep. 491; *Matthiessen* v. *Gusi,* 29 Fed. Rep. 794.

It was the ship's duty, therefore, to ascertain the weight; because she could not lawfully continue to hold possession of the cargo after the consignee was ready to receive it, without informing him, as soon as reasonably practicable, of the amount of freight to be paid. *Nine Thousand Ox Hides,* 6 Ben. 199, 202. There is no such ambiguity in the terms of the bill of lading as to permit their legal effect to be changed by any proof of custom, or by any regulation sought to be imposed by one of the parties to the contract without the consent of the other. Any such change, extremely desirable as it no doubt is, in such cases, for the convenience of both parties, could only be made by mutual agreement, or by further stipulation in the bill of lading itself. *Brittan* v. *Barnaby,* 21 How. 527, 534.

The commencement of the suit on May 4th—two days before the weight was ascertained—was therefore premature, since the libelant did not know how much he had a right to demand, nor the consignee how much he was required to pay. All costs and expenses incident to the premature bringing of the suit must therefore fall upon the libelants. *One Thousand Two Hundred and Sixty-Five Vitrified Pipes,* 14 Blatchf. 274. When the tender was shortly afterwards made,—on the 10th,—the consignee having ascertained the true weight in the mean time, as he had a right to do, though he had no right to demand a custom-house certificate from the libelants, the latter had no right to claim indemnity for the costs and expenses up to that time, but should have accepted the tender, and discontinued their suit. The time taken by the consignee to determine upon this course, rather than to bond the goods in the usual way, was not unreasonable. The tender not being accepted, the continuance of the suit was at the libelant's risk of all the subsequent legal costs and expenses also. Had the cargo not been sold, it must, upon dismissal of the suit, have been returned to the claimant free from all charges and expenses for its arrest and preservation; or, rather, all such expenses would have been charged against the libelants as taxable costs. *The Georgeanna,* 31 Fed. Rep. 405. In this case it was the great expense of keeping the property that made it "perishable." The sale was to avoid that; and the incidental expenses of the sale stood in the place of further expense in keeping the property. Though the proceeds of sale represent the ore, and bound the claimant thereto, so far as relates to the prices that the ore brought, as to all the expenses the claimant ought not to be put in any worse position in consequence of the sale; and all these charges must

therefore be borne by the libelants. The refusal of the tender prevents the libelants from benefiting by the fact that the previous inchoate right of suit had then become perfected, (*The Martha*, Blatchf. & H. 169,) and the special circumstances do not exist here upon which recovery is sometimes allowed in suits premature at the start, (*Eight Hundred and Forty-One Tons of Iron Ore*, 15 Fed. Rep. 615, 25 Fed. Rep. 864.)

2. The cross-libel suit commenced May 5th for the recovery of $3,000 damages was also premature; for the ship still had not only a lien on the ore for the unascertained freight, but also the right of possession, and the right to prevent the ore going out of her presence or control. The discharge into the canal-boat along-side was no waiver of either right. That was not done for the purpose of putting the ore under the absolute possession and control of the consignee, but for mutual convenience in the handling and weighing of the ore in the process of discharge, and to enable the consignee to remove the ore immediately when he should become entitled to its possession upon payment or tender of the freight ascertained to be due. Had any attempt been made to run away with the ore, no doubt a libel and an arrest of the ore would have been sustained to maintain the ship's right of possession, as replevin or trespass would lie upon any similar unlawful attempt to remove the ore, had it been discharged upon the dock. Neither the libel nor the proof shows any such attempt or intention.

The cross-libel, filed May 5th, and served the same day, alleges only that the carriers "willfully and wrongfully refused to deliver" the ore, *i. e.*, on or before the 5th of May. As no payment or tender of freight had then been made, the refusal to deliver was not wrongful, but rightful. The supplemental cross-libel filed in March, 1883, "reiterates the allegations of the libel," and says the weight and freight were ascertained "on or about May 5th, and that thereupon" the amount due was tendered, but delivery of the ore refused. But the weight was not ascertainable till the 6th, and the tender was not made till May 10th; so that it still remains true that the original cross-libel was premature. No cause of action existed when the vessel was arrested on May 5th, and the rule of pleading is that a bill wholly defective cannot be sustained through a supplemental bill founded on matters arising subsequently. *Candler* v. *Pettit*, 1 Paige, 168; *Pinch* v. *Anthony*, 10 Allen, 471, 477; *Mason* v. *Railroad Co.*, 10 Fed. Rep. 334; *Muller* v. *Earle*, 37 N. Y. Super. Ct. 388. The original libelants, had they accepted the tender, would have been entitled on delivery of the ore to a dismissal of the cross-libel, with costs up to that time; and as the tender was not followed by a deposit in the registry, in accordance with rule 72 of this court, it would have had no effect upon the liability for the subsequent costs upon dismissal of the original suit.

The counsel for the cross-libelant, apprehending that his suit might be held to be premature, had, after the tender, again arrested the vessel in the district court of Massachusetts for the refusal to deliver after tender; and thereupon moved here for leave to discontinue the cross-libel, and pay costs. It was opposed on account of the great inconvenience to both

sides to try the case in Massachusetts.   The motion was denied, with leave to file a supplemental libel to the same effect as the libel in Massachusetts, and the supplemental libel was to be treated as an original libel as of that date.   Under this order the consignee is entitled to have his claim to damages adjudicated upon its merits.

The precise nature of this claim of damages is not explained; whether for a conversion of the ore by refusal to deliver, or merely for damages for its detention.   Treating the claim as based on the tender and demand made on May 10th, I think no recovery can be had, either as for a conversion of the ore, or for its detention.   The ore was at that time in the custody of the law, under valid process in a pending suit, brought *bona fide* in a court of competent jurisdiction.   Mr. Marvel had full notice of the suit, and easy means of availing himself of the simple remedies provided by law.   The libelants were merely pursuing a supposed legal remedy in the usual way.   There was no intent to appropriate the goods to the libelants' own use in any other way than the law might adjudicate, and they had an undoubted lien on the ore all the time.   A refusal to deliver, under such circumstances, was plainly no evidence of conversion, nor could it be made the basis of an independent suit of any kind.   The refusal was a legal mistake; but not such a legal wrong as to constitute a basis for an independent suit in admiralty.   The consignee was bound to seek his relief by appearing and defending in the original suit, and was limited to the ample remedies therein afforded.   *Stiles* v. *Davis*, 1 Black, 101; *Hall* v. *Waterbury*, 5 Abb. N. C. 374.

That a libelant is not ordinarily responsible for the detention of a vessel or other property while in the custody of the law under valid proceedings *in rem*, though the libel is ultimately dismissed on the merits, has been repeatedly adjudicated by the highest authority.   In the case of *The Evangelismos*, 12 Moore, P. C. 352, where the wrong vessel was sued for a collision, and was detained in custody, and also in *The Strathnaver*, L. R. 1 App. Cas. 58, 67, it was held that though such damages, if recoverable at all, could be adjudged in the admiralty practice in the original suit, yet no such damages for detention while in custody could be given in the absence of "proof of *mala fides*, or malicious negligence in the libelant."   In the present case there was neither bad faith, malice, nor gross negligence.   The same rule was applied by Judge Choate in this court in the case of *The Adolph*, 5 Fed. Rep. 114, in declining to order security for damages by detention after the dismissal of the libel against a vessel still in custody, during the 10 days allowed for appeal, on the ground that such inconveniences must be suffered in cases free from malice or bad faith, and that the rules providing for the release of the *res* on stipulation, or for its sale, were all the relief designed by the rules of the supreme court against the hardship of arrest.   In the case of *The Peri*, Lush. 543, Dr. Lushington also refused to order security for damages during detention.

It is urged that the ore brought at the sale *pendente lite* about $900 less than its market value; and that, as the suit was improperly brought, the libelant in the original libel ought to make good that loss.   But it is

clear that this claim stands upon at least no greater equity than a claim for detention. The sale was the act of the court in a somewhat higher sense than the arrest under process, since the sale could only be had upon a special order. But both claims are excluded by the same principle that allows a party to resort *bona fide* to the proper tribunals for the enforcement of his supposed rights, without other liability, in case of failure, than the law itself prescribes.

The general rule is that damages to person or property arising in the progress of a suit regularly instituted in good faith, and under the process of a court having jurisdiction, are not recoverable beyond the taxable costs and expenses, unless the law has specially required security for damages also. Upon this point Judge Cooley says:

"It is the lawful right of every man who believes he has a just demand against another to institute a suit and endeavor to obtain the proper redress. * * * To compel him, as the penalty for instituting a suit he cannot sustain, to pay the costs of the defense, is generally all that is just, and is sufficient to make persons cautious about instituting suits which they have reason to believe are baseless." Cooley, Torts, (2d Ed.) 207.

The exceptions are where the process is void, or has been vacated, for being irregularly issued; or where the suit or prosecution was instituted maliciously and without probable cause, or in bad faith, which amounts to a willful abuse of the right to sue, (*Fischer* v. *Langbein*, 103 N. Y. 84, 8 N. E. Rep. 251; *Marks* v. *Townsend*, 97 N. Y. 590; *Landt* v. *Hilts*, 19 Barb. 283; *Hayden* v. *Shed*, 11 Mass. 500; *Barker* v. *Stetson*, 7 Gray, 53; *Langford* v. *Railroad Co.*, 144 Mass. 431, 11 N. E. Rep. 697;) and the malice or want of probable cause must be alleged and proved, (*Goslin* v. *Wilcock*, 2 Wils. 302, 307; *Cardival* v. *Smith*, 109 Mass. 158.) Here nothing of that kind is pleaded or proved.

In common-law suits no bond was formerly required to be given for the arrest of a defendant or an attachment of his goods. Tidd. Pr. Bonds, as well as security for damages, were step by step required in this state by the acts of 1824 and 1831, and by the Revised Statutes, (1 Rev. Laws N. Y. c. 49, § 7; 2 Rev. St. *4, § 12, Id. *230 § 29; *Bennett* v. *Brown*, 4 Comst. 254; Act April 26, 1831, § 35;) and on dismissal only the legal "costs and expenses" were recoverable, unless the statutory bond included "damages." *Van Hovenburgh* v. *Case*, 4 Hill, 541; *Dunning* v. *Humphrey*, 24 Wend. 31; *Groat* v. *Gillespie*, 25 Wend. 383; *Earl* v. *Spooner*, 3 Denio, 246.

There is no suggestion in this case that the sale *pendente lite* was not fairly made; and, being under a valid order of the court, it protects all parties equally with the purchaser, who acquired title under it. *The Trenton*, 4 Fed. Rep. 657, and cases cited. When the process is void, trespass or trover lies; and of course the full value may then be recovered, because the process affords no justification. Drake, Attachm. § 185b.; *Wehle* v. *Butler*, 61 N. Y. 245.

But mere dismissal of the original suit, or a reversal on appeal, on grounds not affecting the jurisdiction, do not affect the validity or regularity of the original process, or of sales *pendente lite*. Story, Confl. Laws,

§§ 592, 593; *Stringer* v. *Insurance Co.*, L. R. 4 Q. B. 676; *Castrique* v. *Imrie*, L. R. 4 H. L. 427; *Groat* v *Gillespie, Earl* v. *Spooner, supra.*

In admiralty causes, in cases like the present, there are special grounds for denying any such damages. The sale was made to prevent the property being eaten up by charges. The result of the suit was uncertain, and the sale was presumably for the benefit of all interested. *Pollard* v. *Baker*, 101 Mass. 259. The owner had personal notice, not only of the original arrest, but of the application to sell. His proctors, after several postponements, finally did not appear to oppose the motion. Had he desired to avert a sale, as he was entirely responsible, it was easy for him at any moment to obtain a release of the goods by the usual practice of the court, upon giving a bond to the marshal under the act of 1845, without the payment of any charges whatever, (*The Georgeanna*, 31 Fed. Rep. 405,) or by stipulation given under rule 10 of the supreme court. As he voluntarily abstained from availing himself of these simple and perfect remedies, a court of admiralty, which acts upon equitable principles, ought not to entertain a suit for alleged damages that have thus, in effect, been voluntarily incurred. He was bound to pursue the remedies provided, or abide the result. *The Adolph*, 5 Fed. Rep. 114; *Stringer* v. *Insurance Co.*, L. R. 4 Q. B. 691. If such suits were to be entertained and damages given, it would virtually put an end to libels *in rem* upon *bona fide* controversies; since no responsible person could safely venture to arrest the *res*, if through some mistake of law or fact, as might be subsequently determined, he must respond for all consequential damages that might arise in the progress of the cause without his fault. Great temptations to fraud would also be offered through purchases by the claimants at low prices, under cover of other nominal purchasers, while large damages would still be demanded. Had the claimants in the cross-libel against the Scandinavia left her in custody and allowed her to be sold, instead of bonding her in accordance with the usual practice, a much larger claim of consequential damage might probably have been presented against the cross-libelant.

The absence of authority, however, even in common-law suits, for the allowance of any such damages except for want of jurisdiction, or for malice or bad faith, neither of which exists here, is conclusive proof that, in the absence of statutory provision, no such right exists; and more clearly still it cannot, under the existing rules, be properly admitted in the law and practice of the admiralty. The supplemental cross-libel, treated as an original suit, must therefore be dismissed, with costs.

The entire proceeds of the ore having been applied either to the payment of the freight, ($804.72,) which was a lien upon it, or to the fees, costs, and charges attending the arrest, custody, and sale of it, the consignee is entitled to tax all these costs and charges against the libelants as a part of his costs on the dismissal of the original libel. The libelants are not entitled to interest on freight in consequence of their refusal of the tender made to them. The amount paid from the fund on account of freight was $928.17. As interest is not allowed, this was $123.45 too much; and the claimant is therefore entitled to a decree for the ex-

cess, with interest from December 24, 1887, the date of payment. The disbursements for the arrest and sale of the ore amount to $409.87. From this must be deducted, however, $24 for six days at the rate of $4 per day, part of the item of $120 paid out of the fund for the use of the canal-boat. The libelants having discharged the ore into the lighter at the claimants' request, the charge for the use of the boat until the freight was tendered on the 10th was a legal charge against the ore; and, if paid by the libelants, it would be added to their lien for freight. *Brittan* v. *Barnaby, supra.* Being paid from the fund, it is paid by Mr. Marvel, to whom it is properly chargeable. This, with $2.40 interest included in that payment, leaves $383.47 to be taxed for these items in favor of the claimant in the original libel, besides any other taxable disbursements.

Both libels are dismissed, with costs. Decrees may be entered as above.