THE BRIG COLLENBERG—*Lawrence, Libellant; Denbreens et al.,*
*Claimants.*

1. A vessel with a perishable cargo, driven by stress of weather out of
   her course and into a strange port for repairs, is not liable for such
   injuries to the cargo as are caused merely by the delay of the voyage.
2. The consignee cannot recover against the vessel for the loss thus occa-
   sioned to the cargo without showing some fault, misbehavior, or
   negligence of the master or crew.
3. If the master was justified in putting into a port for repairs—if he
   used proper diligence in getting the repairs made—if he exerted
   himself to preserve the cargo under the best advice he could get—
   and if he was unable to send the cargo forward by another vessel—
   his conduct is blameless, and the consignee has no claim against
   the vessel.
4. When some portion of a perishable cargo has suffered by decay with-
   out the fault of the master, and was for that reason left behind on
   the voyage, the ship-owners are entitled to recover for the freight on
   all that was duly transported and delivered.

This was a libel in the Circuit Court of the United States
for the southern district of New York, filed by John S. Lawrence
against the brig *Lieutenant Admiral Collenberg*, for damages
suffered by a cargo of fruit shipped at Palermo for New York
and injured by decay on the voyage. The owners of the ves-
sel denied the right of the consignee of the cargo to recover
the damages he claimed, and filed a cross-libel for freight,
primage, general and particular average. The District Court
dismissed the libel in the first suit, and in the other made a
decree in favor of the ship-owners for the freight, &c. This
was affirmed by the Circuit Court, and the consignee took
appeals to this court in both cases.

The facts are specially stated in the opinion of Mr. Justice
Clifford.

*Mr. Donohue*, of New York, for appellant. The claimants
are common carriers, and cannot discharge themselves from
loss except by the act of God or the dangers of the seas. An-

gel on Carriers, § 87. They must prove the loss occurred by these perils. Angel, 193; 21 Wend., 190. The nature of the cargo being tender, extra care was required on the part of the carrier. Angel, §§ 5 and 6. The facts show that the delay at Lisbon was protracted unnecessarily, and the management of the fruit improper and ruinous to it. The rule is settled, that if any act of the captain is injurious to the cargo or goods of another he cannot say that other damages helped, or that something else would have injured the goods if he had not. If any distinction is to be made in the nature of the damage, he must clearly show what part of the damage occurred entirely without his fault. 18 How., 233.

All the excuses given for the great delay at Lisbon are insufficient and do not agree with the facts. The log-book of the ship shows that the weather was not unfavorable to work; and had it been stormy, the sails, spars and rigging could have been making ashore under cover. The other reasons for delay are no better founded. Add to this the fact that the fruit was placed in a damp storehouse, exposed to the weather, and picked and handled in a fashion certain to induce decay, and the whole case shows gross carelessness on all points.

*Mr. Owen*, of New York, for appellees. The decree dismissing the libel for loss and damage to the fruit should be affirmed. Beyond question the brig sustained such sea-damage as compelled her to bear away and put into Lisbon to repair. The evidence shows that the repairs were completed with reasonable diligence, considering the stormy weather, the holiday season, which kept mechanics from their work, and the fact that there was no dock in which a ship could lie up for repairs, but only an open roadstead.

If the repairs were not completed with despatch, and if some unnecessary delay occurred in making them, still that is not sufficient to render the vessel liable for the loss of the fruit. There is no allegation in the libel of any such delay, or that the fruit perished from it. *McKinlay* vs. *Morrish*, (21 How., 343.) The fruit had a strong inherent tendency to decay, and, in the absence of positive proof, it may be inferred that it per-

ished from such cause, and not from the delay. The bill of lading excepts tendency to decay. *Wissman* vs. *The "Howard,"* (18 How., 231;) Angel on Carriers, § 210; Story on Bailments, 492 a. The acts of the master respecting the examination and re-assortment of the fruit were proper and within the line of his duty, which was to do all that he could to arrest decay as soon as he discovered it. Angel on Carriers, §§ 160, 210; *Bird* vs. *Croswell*, (1 Miss. R., 81;) *Choteaux* vs. *Leech*, (18 Pa. Rep., 224;) *Lyn* vs. *Fisher*, (12 Miss. R., 272.)

The survey called by the master was in accordance with usage and his legal duty. There is no question that he acted in perfect good faith, and in the exercise of his best judgment, and the vessel should not be held responsible for the damages. The master was the agent of all concerned in reference to the fruit as well as the vessel, and his acts were therefore binding on the owner of the cargo. *Judson* vs. *Warren Ins. Co.*, (1 Story's C. C. R., 342;) Flanders on Shipping, § 173.

On the question of our claim for freight: Having performed the voyage and delivered the cargo according to the bill of lading, the respondent was entitled to his freight upon the portion delivered, notwithstanding some parts thereof were damaged. The items for general and particular average were properly allowed. The bill of lading expressly stipulates for the payment of freight with "average accustomed," by which it is supposed the parties meant the ordinary general and particular average to which the cargo might become subject in the course of the voyage. It is clear that the expenses of wages and provisions from the time of bearing away to Lisbon, at least for the time allowed by the District Court, were for the common benefit of all, which, by the well-settled law in the United States, were to be contributed for in general average. 2 Phil. on Ins., (2d ed.,) 120, 121; Abbot, (5th Am. ed.,) 596, note; *United States* vs. *Wilder*, (3 Sumn. R., 308.) The expenses of unlading, storing, &c., the fruit were incurred for its special benefit, and was therefore a *particular* average; in other words, a *special charge* thereon, which was recoverable in this action. All these expenses were incurred by the master in good faith and in the exercise of his best judgment for

the safety and preservation of the fruit, and the law gave him a lien for reimbursement. *Mut. Safety Ins. Co.* vs. *Cargo Brig George,* (Olcott's Ad. Reps., 89;) 2 Arnould on Ins., p. 953.

Mr. Justice CLIFFORD. These are appeals in admiralty from the respective decrees of the Circuit Court of the United States for the southern district of New York. Both of the suits were founded upon the same transaction, and depend substantially upon the same facts.

One was a suit *in rem* against the brig L. A. Collenberg, brought by the appellant, in which it was alleged that certain merchandise, consigned to the libellant, was shipped at the port of Palermo, on the twelfth day of December, 1855, on board the brig, in good order and condition, and that the master signed bills of lading, agreeing to deliver the same in like good order and condition to the libellant, at the port of New York; and the charge in the libel was, that he had failed to deliver seven hundred boxes of lemons, and two thousand one hundred and fifty boxes of oranges, constituting a large portion of the cargo.

Service of process was waived, and the claimant of the brig appeared, and, by consent, entered into stipulation, both for the costs of the suit and the value of the vessel. They also made answer to the suit, denying the allegations of the libel, and averring that the merchandise mentioned in the bill of lading, except four hundred and fourteen boxes of lemons and oranges, which perished from their own inherent tendency to decay, had been duly transported and delivered to the libellant in like good order and condition as when laden on board, saving, only, the damage occasioned by the perils of the seas, and such as resulted from the natural decay of the fruit.

On the second day of July, 1856, they also filed a cross-libel against the appellant, as consignee of the cargo, to recover the freight for the transportation of the same, in which they alleged that they had fully performed the contract set forth in the bill of lading, and were entitled to have and receive of the respondent, for the freight and primage, including charges, the sum

of twenty-eight hundred and sixty-two dollars and forty-seven cents.

Most or all the testimony was taken in the first suit, but the same was also used, by stipulation, in the cross-libel; and, after a full hearing, the District Court dismissed the libel against the brig, and in the cross-action entered a decree in favor of the libellants for the freight, or so much of the same as was due for that portion of the cargo which had been transported and delivered. Both decrees, on appeal, were, in all things, affirmed in the Circuit Court; and thereupon the present appellant, who was the libellant in the first suit and the respondent in the second, appealed both cases to this court.

It appears, from the pleadings and evidence, that, on the twelfth day of December, 1855, seven hundred boxes of lemons, and two thousand one hundred and fifty boxes of oranges, together with other merchandise not necessary to be specified, were shipped on board the brig, then lying at Palermo, and bound for New York, and that the master signed bills of lading, undertaking to transport the same to New York, and there deliver the same to the appellant, or his assigns, on payment of the stipulated freight, the dangers of the seas and the liability of the fruit to decay excepted.

According to the testimony of the master, the brig, with her cargo on board, sailed from Palermo on the sixteenth day of the same month, but, while pursuing her voyage, she encountered heavy gales; and on the second day of January following the sea broke over the forward part of the vessel, and carried away the jib-boom, the flying jib-boom, and both topmasts, and they were obliged, in the emergency, to cut away the rigging, to clear the jib-boom from the vessel, and get rid of the broken spars. Both topmasts broke off about half-way between the caps and the cross-bars; and they lost in the disaster the mainsail, the two topsails, the gallant-sail, and the spanker. Crippled and disabled as the vessel was, she was obviously incapable of proceeding on her voyage; and, consequently, the master found it necessary to bear away and put into Lisbon for repairs, which was the nearest port. She

arrived off the bar at that port on the fifteenth of the same month, and two days later was able to come to anchor in the roadstead, about a mile from the shore. Vessels arriving at that port are obliged, as the witnesses state, to anchor in the stream, because there are no docks or piers in the harbor to which, in rough weather, they can be moored. On the following day, the master applied to the consul for a survey of the vessel, to estimate damages and cost of repairs, and the survey was ordered on the same day the application was made, but four days elapsed before the persons appointed to make the survey were able to go on board, in consequence of the storm, and the roughness of the sea.

They made their report on the twenty-second day of the same month, specifying the nature of the repairs required, and estimating the cost; and on the same day the master of the brig, after consulting with the consul upon the subject, applied to him for an examination and survey of the fruit, and it was immediately ordered. Persons experienced in the business were accordingly appointed by the consul for that purpose, and, on the thirtieth day of the same month they went on board and made the necessary examination. By their report it appears that they found the boxes containing the fruit properly stowed in the vessel, and the place of stowage properly ventilated; but, upon opening a certain number of the boxes, they ascertained that some of the fruit was rotten, and other portions of it were beginning to decay. Under those circumstances, the surveyors directed that the boxes should be discharged and placed in a well-aired storehouse, until the vessel could be repaired and made ready to resume her voyage. That order was carried into effect, and on the ninth day of February following the surveyors made a second examination of the boxes, and, finding that the measures previously recommended and adopted were insufficient to accomplish the object, they directed that the boxes should be opened, and the unsound fruit entirely separated from that which was sound and fit for use. Competent and experienced persons were accordingly designated and employed for that purpose; and the testimony shows, that in executing the order, they condemned and threw

away as worthless an amount of the fruit equal to four hundred and fourteen boxes. Those persons entered upon the performance of their duty on the day they were designated, and on the nineteenth day of the same month the surveyors by whom they were selected made a report, approving what they had done for the preservation of the fruit. Throughout this period the repairs upon the vessel were being executed, and, on the twenty-fifth day of the same month the surveyors appointed to examine the brig reported that the repairs were completed, and that she was in a condition to prosecute her voyage. Three days afterwards the master executed a bottomry bond to raise money to defray the expenses incurred in executing the repairs and in carrying out the measures recommended for the preservation of the cargo; and, on the fourth day of March, 1856, the brig sailed for New York, but in consequence of bad weather she did not arrive at her port of destination until the twentieth day of May following. Much of the fruit repacked at the port of distress, in the meantime, had deteriorated, and some of it had become worthless; but it is not pretended that there was any fault in the stowage, or any negligence or want of care on the part of the master during that part of the voyage. On the arrival of the vessel, all of the fruit, except what had been condemned and thrown away, as before sated, was duly tendered to the consignee, but he refused to receive it, claiming that the loss and deterioration were chargeable to the misconduct of the master at the port of distress.

1. It is conceded that the injuries received by the brig on the second of January fully justified the master in bearing away and running into Lisbon as a port of distress to refit the vessel and rendering her capable of continuing and prosecuting the voyage. That concession was very properly made, as the evidence is full to the point and entirely satisfactory. Fault is not imputed prior to the disaster, either to the master or owners; and it would seem that the charge could not be sustained, if made, as the evidence shows that the vessel was staunch, the cargo properly stowed, and every reasonable precaution taken to give it sufficient ventilation.

None of these matters were drawn in question at the argument, but it was insisted by the appellant in the suit against the vessel, that the repairs were not executed with proper diligence, and that the discharge of that portion of the cargo in question, and the opening of the boxes and the taking out and repacking the fruit, were improper and injudicious, and had the effect to promote and increase the inherent tendency to decay. Much testimony was taken on the first point, and in some of its aspects it is conflicting, but when considered in connection with the circumstances, as explained by the witnesses who were present and saw the difficulties which occasioned the delay, it is quite obvious that the proposition cannot be sustained. Some twenty-five or thirty other vessels put into that port about the same time for the same purpose, which created an unusual demand for the labor of mechanics. According to the statements of the witnesses, the mechanics there were few in number, and not very efficient; and what added to the difficulty was, the circumstance that it was the carnival season, and consequently the mechanics refused to work during the festivals and holidays, which for a time included two or three days in the week, and on one occasion they "struck" for higher wages, and refused to work at all for several days. Among the vessels that put into the port for repairs at that time were two bound to New York, and neither of them sailed till after the brig; and all the witnesses who were on the ground, and have any knowledge of the actual circumstances, agree substantially that the repairs were made as soon as they could be in that port at that time. Witnesses, residing in New York, express the opinion that the repairs might have been executed in much less time, and their testimony undoubtedly is correct as applied to any commercial port in the United States; but the master in this case was obliged to refit his vessel in the port of distress where she was anchored, and it must be assumed that those who witnessed his conduct have the best means of judging with what fidelity he performed his duty.

2. Two vessels only were in port bound to New York, and both of those were there for the purpose of repairs, and of course were not in a condition to bring forward the cargo of

the brig. Unable, as the master was, to employ another vessel and send the cargo forward, it was certainly his duty to take all possible care to preserve it. Looking at the whole evidence, it is clear that he sought the best advice that he could obtain, and followed it faithfully; and, notwithstanding the opinion expressed by certain witnesses to the contrary, we are by no means prepared to admit that he did not pursue a judicious course to prevent the fruit from perishing. In view of all the facts and circumstances, we think the point is without merit, and it is accordingly overruled. 3. Having come to that conclusion, one or two remarks in regard to the suit brought by the owners of the vessel will be sufficient. They having established the fact that the loss and decay of the fruit were not occasioned by the fault of the master, were clearly entitled to recover for the freight on all that portion of the cargo that was duly transported and delivered. No question was made as to the amount in the Circuit Court, and it is not pretended that the question ought to be opened here in case the other decree should be affirmed. After a careful consideration of the evidence, we have come to the conclusion that the decision of the Circuit Court was correct, and the respective decrees are accordingly affirmed, with costs.