## The Eugene Vesta.

*(District Court, E. D. Michigan.* February 15, 1886.)

Towage—Compensation—Vessel Aground—Authority of Master.

Where a vessel in process of loading was driven ashore and damaged, and the owner of the cargo demanded a return of the property shipped by him, offering to pay the expense of unloading, but the master refused this, and employed a tug to haul the vessel off and tow her to a place of safety, *held,* the master had no power to bind the cargo, and the owner of the tug must look to the vessel alone for his compensation.

In Admiralty.

This was a libel against the scow Eugene Vesta and her cargo, to recover for the services of the tug International in rescuing the scow and her cargo from being wrecked on the shore of Lake Erie at the port of Tyrconnell during the month of August, 1885. The services were renderd at the instance of the master of the scow. The scow was loading wood for transportation to Detroit, and had taken on board about 80 cords, or two-thirds of a load, when a storm arose, which rendered it necessary to stop loading. The storm increasing, the vessel began to drag her anchor; and the master, fearing that if she drifted ashore she would be lost, voluntarily beached her not far from the dock, after throwing overboard some 15 or 20 cords of wood. The vessel suffered some damage from the stranding; and, as there were no means of getting her off the beach, the master telegraphed the owner, who sent the tug International, owned by the libelant, and the lighter Benedict, together with a steam-pump, to effect her rescue. The tug and lighter, with the steam-pump, left Windsor about noon of August 23d, but, meeting with heavy weather, were obliged to lie over at Port Stanley, and did not reach the wreck until the evening of the day following their departure from Windsor. Arriving at the place of stranding, the tug pulled the scow off without much difficulty, and brought her to Trenton with 60 or 65 cords of wood on board. The value of the vessel as she lay stranded upon the beach was estimated at from $600 to $900, and the value of the wood at the place of loading was three dollars to three and a half per cord. There was testimony tending to show that the wood had depreciated by the water-logging of the vessel. The wrecking expedition arrived at Trenton in safety, but was there detained overnight, and did not reach Detroit until about noon of the next day. No tender was made to the libelant on behalf of the vessel or cargo, and no payment made for the services of the tug, lighter, or steam-pump. No appearance

was entered on behalf of the scow or owner. The owner of the cargo appeared, and filed an answer denying that the libelant had any claim or lien against the cargo. It appeared that while the scow was aground at Tyrconnell, and before the arrival of the tug, the claimant of the cargo demanded the return of the wood remaining on board, and offered to unload it himself without expense to the vessel or to the master. The evidence shows that this could have been done at a very trifling expense, but the master declined to allow the claimant to take off the wood, because, as he said in his deposition, *it might imperil the vessel.* There was practically no dispute as to these facts, both the claimant and master testifying to substantially the same thing. It appeared that, after the wood was unloaded in Detroit at the dock, the consignees paid the scow upwards of $80 for freight, and for extra expenses claimed by the master on account of the services of the tug. At the time of this payment, the consignees had no notice that the libelant would make any claim against the cargo, and they received the cargo, and settled with the master, without notice of libelant's claim.

*H. H. Swan,* for libelant.

*F. H. Canfield,* for owner of the cargo.

Brown, J. The real question in this case is whether the owner of the wood had the right, after the vessel had gone ashore at Tyrconnell, and before she had broken ground upon her voyage, to demand a return of the wood upon payment of the expenses, or whether the lien of the master had attached to the cargo, so that he had a right to bring it to Detroit, and compel it to contribute to the general average occasioned by the stranding. There can be no doubt there is an implied warranty on the part of the carrier that his vessel shall be seaworthy, not only when she begins to take cargo on board, but when she breaks ground for the voyage. The theory of the law is that the implied warranty of seaworthiness shall protect the owner of the cargo until his policy of insurance commences to run; and, as it is well settled that the risk under the policy attaches only from the time the vessel breaks ground, this is fixed as the point up to which the warranty of seaworthiness extends. The case of *Cohn* v. *Davidson,* 2 Q. B. Div. 455, is a recent and instructive authority upon this point, and lays down a principle of general application. In this case the owners of a vessel chartered her to carry a cargo of cement from Sunderland to Dundee. After starting, the vessel became leaky; but, the wind being fair for the voyage, the captain resolved to go on, and the vessel sank, with her cargo on board, before reaching her port of destination. It appeared that the ship was not in fact seaworthy at the time she set sail, and that, as she was found to be seaworthy when she commenced taking cargo, she must have received the damage in the course of loading. In delivering the opinion of the court, Mr. Justice Field observed that "no degree of seaworthi-

ness for the voyage at any time anterior to the commencement of the risk will be of any avail to the assured unless that seaworthiness existed at the time of sailing from the port of loading. As, therefore, the merchant, in a case like the present, would not be entitled to recover against his underwriter by reason of the breach of warranty in sailing in an unseaworthy ship, it would follow that, if the warranty to be implied on the part of the ship-owner is to be exhausted by his having the ship seaworthy at an anterior period, the merchant would lose that complete indemnity, by reason of the two contracts being taken together, which it is the universal habit and practice of mercantile men to endeavor to secure." The defendant was held liable for the value of the cargo lost.

In the case under consideration it is clear that, if the owner had insured this cargo to Detroit, the policy would not attach until the ship had broken ground for the voyage, and therefore, from the time the cargo began to be delivered to the vessel until the time she broke ground for the voyage, it would be uninsured, if the theory of the libelant in this case be sound. As she was taking in her cargo at a very exposed point on the open lake, and might become unmanageable at any moment by a sudden rise of wind, the danger was a real one, and yet one which would not be covered by the policy. In such case it is but just that the responsibility of the owner for the seaworthiness of his ship should be kept alive up to the moment of her departure. Not only is this so, but it is now the settled law of the federal courts that the lien of the master for freight does not attach before the vessel breaks ground, although there seems to have been some conflict of authority formerly upon this question. *The Tornado*, 108 U. S. 342, 349; S. C. 2 Sup. Ct. Rep. 746; *Burgess* v. *Gun*, 3 Har. & J. 325; *Bailey* v. *Damon*, 3 Gray, 92; 1 Pars. Shipp. 179, note; and the owner may demand a return of the cargo in case the vessel becomes unseaworthy, upon paying the expense of lading and unlading, and the demurrage. *Clemson* v. *Davidson*, 5 Bin. 392; *Keyser* v. *Harbeck*, 3 Duer, 373.

The excuse given by the master of the Vesta for his failure to do this was that it might imperil the vessel; but conceding this to be sufficient. and that he was thereby excused from complying with the demand of the consignor, it did not authorize him to pledge the cargo for salvage services rendered solely for the benefit of the vessel, and in the face of the demand of the consignor for the return of his property. The authority of the master to bind the cargo arises only in case of necessity, when the owner cannot be consulted, and I know of no case in which it has been held that he can do this against the protest of the owner. In *The Julia Blake*, 107 U. S. 418, 426, S. C. 2 Sup. Ct. Rep. 692, it is said that "the master can neither sell nor hypothecate the cargo, except in case of urgent necessity; and his authority for that purpose is no more than may be reasonably implied from the circumstances in which he is placed. He acts for the owner

of the cargo because there is a necessity for some one to do so, and, like every agent whose authority arises by implication of the law, he can only do what the owner, if present, ought to do. Necessity develops his authority, and limits his powers. What he does must be directly or indirectly for the benefit of the cargo, considering the situation in which it has been placed by the accidents of the voyage." The court, in this case, quote with approval the English rule that the master cannot bottomry the ship without communication with the owner, if communication be practicable, and, *a fortiori*, cannot hypothecate the cargo except under like circumstances.

Upon the facts of this case it appears to me entirely clear that the master acted without authority, so far as the cargo was concerned, in summoning the libelant's tug to his assistance, and that libelant was bound to take notice of this. It is a general principle that all persons dealing with the master of a vessel are bound to inquire into his authority to act, and, in case of the want of such authority, will not be protected, even though they may have acted in good faith. 1 Pars. Shipp. 147.

The libel, as against the cargo, must be dismissed.