## HOWARD v. 9,889 BAGS OF MALT.

(District Court, D. Massachusetts. February 15, 1919.)

No. 1567.

1. ADMIRALTY ⬤⟫36—SCOPE OF JURISDICTION—SET-OFF.
 A set-off is unknown to the admiralty law, except as a credit on the transaction which forms the subject of the libel.

2. SHIPPING ⬤⟫154—LIEN FOR FREIGHT—STORAGE OF CARGO.
 A ship does not lose her lien on a cargo for freight by delivery to a public warehouse for storage without intention to deliver to the consignee.

3. MARITIME LIENS ⬤⟫1—FAVORED BY COURTS—ACTS WHICH WILL DEFEAT.
 A maritime lien is one favored by the courts and will be enforced, unless clearly displaced by the acts or agreements of the parties.

In Admiralty. Suit by Thomas J. Howard against 9,889 Bags of Malt. Decree for libelant.

⬤⟫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Hill, Barlow & Homans, of Boston, Mass., for libelant.
Pitt F. Drew, of Boston, Mass., for petitioner France & Canada
S. S. Co., Limited.
George Everett Kimball, of Boston, Mass., for petitioner Hustis.
Pitt F. Drew, of Boston, Mass., for claimant.

HALE, District Judge. This is a suit in rem to enforce a lien of
the libelant upon the cargo of the ship George S. Repplier for carry-
ing 9,889 bags of malt from Hoboken, N. J., to Mystic Wharf, Bos-
ton, and for four days demurrage.

The contract of carriage is shown by the bill of lading, by corres-
pondence, and by oral testimony of conferences of the libelant with
one Elder, who appears to have been the agent for Renke, the undis-
closed principal. It appears that the undertaking on the part of the
libelant was to get the malt to Boston, to deliver it to Mystic Wharf,
and to use all diligence to catch the steamship Moorish Prince, upon
which the malt was to be carried from Boston to a foreign port.

From an examination of the proofs, it appears that the contract was
made on July 12, 1917. On July 13, at 7 in the morning, the libelant
produced the barge for loading in Hoboken, N. J. Late in the after-
noon of July 15, the barge was being loaded by the shippers. The
necessary bills of lading were not produced until July 16. The barge
then sailed through Hell Gate on July 17, and proceeded the same
day to Whitestone Head off Long Island Sound.

The testimony must be held to prove that up to July 17, the time
which had elapsed was due to the loading of the barge by the ship-
pers, over which the libelant had no control, and to the delay of the
shippers in producing the necessary bills of lading. The voyage was
made without further delay, except for the thick fog which prevailed.

The testimony tends to show that the delay in reaching Boston was
from no fault of the libelant, but from conditions of weather, or, in
other words, from perils of the sea.

The libelant engaged a towing company to take the barge; he also
gave orders for prompt action. He appears to have used reasonable
diligence in making the voyage. His contract was not to reach the
Moorish Prince, in any event before she sailed, but to use all diligence
to reach her.

He has met the burden of proving that he did use such diligence,
and that he performed his contract.

[1] At this point it must be observed that the claimant makes a de-
mand that a certain set-off should be allowed because of breach of
contract on the part of the libelant. It is not necessary to go into the
question whether the testimony shows such breach. It is enough to
say that, under the law, these damages cannot be recovered by set-off,
but must be recovered by a separate action. A set-off is unknown to
the admiralty law, except as a credit on the transaction which forms
the subject of the libel. O'Brien v. Bags of Guano (D. C.) 48 Fed.
726, 730. The claim for damages is a personal right on the part of
the owner against the carrier, and is not a claim upon the cargo it-
self. The Giulio (D. C.) 34 Fed. 909.

[2] A sharp contention is made by the claimant that the lien of the libelant has been lost by the discharge of the cargo, and by abandonment of possession. The testimony makes it clear that on the arrival of the ship at Mystic Wharf, the steamship Moorish Prince had sailed. No consignee or other claimant appeared to accept delivery of the cargo. The only person to supervise the unloading was one Ackerly, the superintendent of the pier. The malt was stored on the pier, in the warehouse of the Boston & Maine Railroad, a public warehouseman, and not shown to be an agent of the consignee. The malt was received by the Franco & Canadian Steamship Company as a deposit for the benefit of both parties. The testimony fails to prove that it was delivered to the consignee, or that such was the intention of the parties. On the other hand, the proofs are clear that on August 8th, as soon as he heard of the discharge of the cargo, the libelant sought to enforce his lien; that he went to Elder, the agent of the claimant and told him that he should libel the cargo for his freight. This appears from Elder's testimony. The testimony is convincing that the libelant did not intend to abandon his lien by giving up possession; that the cargo was received by the France & Canadian Steamship Company; and that this company was wholly a stranger to the obligation to pay freight.

[3] The maritime lien is one favored by the courts; it will be enforced unless clearly displaced by the acts or agreements of the parties. In Bags of Linseed, 66 U. S. (1 Black) 108, 114 (17 L. Ed. 35), in speaking for the court, Mr. Chief Justice Taney observes:

"Courts of admiralty, when carrying into execution maritime contracts and liens, are not governed by the strict and technical rules of the common law, and deal with them upon equitable principles, and with reference to the usages and necessities of trade. * * * It is the interest of the shipowner that his vessel should discharge her cargo as speedily as possible after her arrival at the port of delivery. And it would be a serious sacrifice of his interests if the ship was compelled, in order to preserve the lien, to remain day after day with her cargo on board, waiting until the consignee found it convenient to pay the freight, or until the lien could be enforced in a court of admiralty."

See, also, Costello v. Cargo of Laths (D. C.) 44 Fed. 105; The Anna Kimball, 2 Cliff. 4, 15, Fed. Cas. No. 7,772.

Under the maritime law of this country, a manual turning over of cargo by shipowners to an independent warehouseman, or even to the consignee itself, does not of itself operate of necessity to discharge their lien for freight. Where the intent of the shipowners in making such delivery is merely to discharge the cargo, and not to deliver it, their lien for freight remains in full force. 600 Tons of Iron Ore (D. C.) 9 Fed. 595, 597; 151 Tons of Coal, 4 Blatchf. 468, Fed. Cas. No. 10,520; Davidson S. S. Co. v. Bushels of Flaxseed (D. C.) 117 Fed. 283.

In the case before me, the testimony proves that the libelant has earned his freight, and that he did not intend to lose his lien by abandonment of possession. According to the liberality of the admiralty law, he is still able to enforce the lien against the cargo. The price for the libelant's services, fixed by the contract, appears to have been

a reasonable one. He paid out $750 for towage to Cape Cod Canal; $60 for canal charges; $175 from the canal to Boston—making nearly $1,000 for towing alone. The value of the barge is fixed at $55 per day. I am of the opinion that the libelant, by competent testimony, has proved his case for freight under his contract as claimed in his libel, and that he also has established his claim for demurrage as set forth in his libel. I do not allow interest.

A decree may be presented for the libelant, for the sum of $2,649.07. The libelant recovers costs.