CLIFFORD et al. v. MERRITT–CHAPMAN &
SCOTT CORPORATION et al.

No. 6392.

Circuit Court of Appeals, Fifth Circuit.

April 15, 1932.

1022

Burton G. Henson, of Tampa, Fla., for appellants.

K. I. McKay, Maynard Ramsey, G. L. Reeves, Claibourne M. Phipps, W. H. Jack-

son, and J. W. Cone, all of Tampa, Fla., for appellees.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

This is an appeal from a decree in admiralty by which seamen were awarded a first lien for their wages on the ship but none on the cargo, and a tug owner and a warehouseman were given liens of equal dignity on the cargo. All are dissatisfied. The material facts so far as found are these: The steamship Santa Ana of Tampa, Fla., sailed from Seattle with a cargo of crated apples, canned salmon, and reindeer meat in the hold and lumber on the deck, consigned by various shippers to themselves at Tampa, except that some of the apples were consigned to Wilmington, N. C. The apples and meat were kept refrigerated by machinery. On the trip the boilers and refrigerating machinery failed and the ship got short of water. After passing through Panama Canal rough weather was encountered. The ship began to leak badly and sent out wireless distress calls, in response to which the Athelchief took her in tow to the harbor of Grand Cayman and anchored her there in safety. The wrecking tug Warbler owned by Merritt-Chapman & Scott Corporation had also answered the call and at Grand Cayman, after conference with the master, communicated by wireless with her owners and they contracted with the owner of the Santa Ana at Tampa to tow her to Tampa for $4,500 plus additional requirements at scheduled rates. The Warbler accordingly took the Santa Ana in tow, installed additional pumps on her, and through a steam line assisted in running her refrigerating plant. With some aid from the Santa Ana's engines the Warbler brought her over calm seas to the wharf of Tampa Union Terminal Company at Tampa on December 27, 1929. The next morning a marine survey was had of vessel and cargo. The vessel was found leaking and advice was given that the cargo be removed and stored for the benefit of all concerned. Accordingly, with the consent of the ship's officers, Tampa Union Terminal Company through stevedores discharged the cargo across the dock into its warehouse, putting the apples and meat in cold storage, and the salmon and lumber in dry storage. On December 30, 1929, Merritt-Chapman & Scott Corporation libeled and attached the ship and cargo, claiming a lien against both for $7,555 for towage and

additional services. On January 2, 1930, the seamen of the Santa Ana libeled her, her freight and cargo for wages, reciting the former libel and seizure and designating theirs as an intervening libel but obtaining no order to file it as such. The owners of the Athelchief also libeled for salvage. By January 10, 1930, the apples and meat had been sold under order of the court as perishable. On that date Tampa Union Terminal Company petitioned the court to be paid its charges for stevedoring, refrigeration, storage, and dockage as costs. On January 11th it filed an intervening libel, asserting a lien therefor on vessel and cargo. Claim was made for the vessel by her owner, and the various libels were answered. One Hedrick claimed the proceeds of the apples, also answering the libels. No one claimed the salmon, meat or lumber, which were later sold, as was the vessel after long and expensive delay, at very disappointing prices. The court ordered all libels and petitions to be consolidated, and to be considered as intervening in the first libel. The salvage claim of $1,000 was conceded by all and paid, two-thirds from the proceeds of cargo and one-third from the proceeds of the vessel. The court decreed $6,521.62 as wages to the seamen, with a first lien on the proceeds of the vessel, of which only a few hundred dollars remained, and denied a lien on the cargo. The owners of the Warbler were awarded $7,555.84, and given a lien on the proceeds of the cargo. The warehouseman after payment of a portion of its claim as costs accruing since the seizure was awarded $2,186.95 for stevedoring, wharfage, refrigeration, and storage, with a lien on the proceeds of cargo ranking with the towage. The proceeds of cargo after paying costs and salvage are but $4,856.52.

The seamen's libel was not perfected as an independent libel by a warrant of arrest, nor allowed originally as an intervening libel by order of the court under Admiralty Rule 34 (28 USCA § 723). The order of consolidation, however, expressly ordered that it be treated as an intervening libel and supplied any want of original allowance. The libel should not be dismissed. It alleged that freight had been earned by the ship in a sum of $11,520 which was unpaid. The answers of the claimants denied that any freight had been earned except upon the lumber. Tampa Union Terminal Company answered that it had no knowledge on the subject. In this state of the pleadings the burden of proof was left on the seamen. No evidence was taken on the ques-

tion of freight save the general statement of the master that he had read the libel and its statement of facts was true. The libel also alleged that none of the cargo had been delivered, and there is a stipulation signed by all litigants that, "No delivery of cargo nor tender thereof was made by the Santa Ana to the consignees." At the final hearing the proctor for the seamen moved to be allowed to give further evidence by the bills of lading and by the ship's agents of the amount of freight on each lot of the cargo, and that it was unpaid, to wit: Apples consigned to Tampa, $4,914; apples consigned to Wilmington, $5,607; reindeer meat, $37.30; salmon, $280; lumber, $184. The motion was refused for the assigned reason that the seamen had been contending for a lien on the entire cargo and not merely on the freight, and evidence had been taken on that theory and time allowed to produce authority to sustain that contention. The additional reason is now urged that under the quoted stipulation and the plain facts no freight could have been earned. The seamen could produce no authority for a lien for wages on the entire value of the cargo, for there is none. The shipper of goods does not bind them to the ship for the wages of the seamen, but for the agreed freight, out of which the ship should pay wages. Except when salvage is involved the seamen look to the ship and to the freight only. Sheppard v. Taylor, 5 Pet. 675, 8 L. Ed. 269. But if the freight is not paid, since the ship has a lien on the cargo therefor the seamen are allowed in effect to enforce the ship's lien for the agreed freight; or in case the shipowner owns the cargo also, to enforce the ship's lien for a reasonable freight. Poland v. The Spartan, Fed. Cas. No. 11,246; Whitney v. Tibbol (C. C. A.) 93 F. 686. The seamen thus come to have an indirect but enforceable lien on each lot of the cargo for the earned unpaid freight due on it. We do not think the stipulation or the facts make it impossible that freight has been earned in the present case. With no contract or custom shown to the contrary, the ship before demanding freight is bound to bring the goods to destination, The Tornado, 108 U. S. 342, 2 S. Ct. 746, 27 L. Ed. 747, and to deliver them on the wharf so as to allow examination, Brittan v. Barnaby, 21 How. 527, 16 L. Ed. 177, and to notify the consignees or owners, Hutch. Carriers (3d Ed.) §§ 687, 689, 695. If they cannot be notified, or if the freight is not paid, the goods should be stored safely until freight is paid and delivery can be accom-

plished. The Thames, 14 Wall. 98, 20 L. Ed. 804. Upon such storage the ship ceases to be carrier, but has earned her freight and retains her lien therefor. Brittan v. Barnaby, supra; Howard v. 9,889 Bags of Malt (D. C.) 255 F. 917; Hutch. Carriers (3d Ed.) §§ 688, 880. This record shows no findings of the facts touching notice to the consignees. As to the lumber, salmon, and meat consigned to Tampa it is entirely possible that the consignees could not be found and notified. Hedrick became the owner of the apples on January 2d after the seizure, and but for the seizure tender of delivery of those consigned to Tampa might have been made to him. Pending notice and delivery it was no conversion of the cargo by the ship, but rather a discharge of duty to put it in proper storage for its safety, and the freight was not thereby forfeited. The seizure a day later would prevent delivery in ordinary course; but since, as will appear, no one had a lien on the cargo beyond the freight and storage, the consignees would by paying these charges have gotten their several cargoes from the court. The ship's right to freight was not destroyed by the seizure. As to the apples consigned to Wilmington, not delivered at destination but sold apparently without the owner's knowledge or consent, no freight even pro rata itineris was earned. Caze v. Baltimore Ins. Co., 7 Cranch, 358, 3 L. Ed. 370. Furthermore, the history of the voyage and the price obtained for the apples indicate that there may have been deterioration or loss of them due to the fault of the ship, in which case a credit against the ship's freight may have accrued. See 24 R. C. L., Shipping, §§ 463, 490, 497; 4 R. C. L., Carriers, §§ 285, 314; 6 Cyc. 497; Howard v. 9,889 Bags of Malt (D. C.) 255 F. 917; The Water Witch, 1 Black, 494, 17 L. Ed. 155; The Collenberg, 1 Black, 170, 17 L. Ed. 89. Whether such counterclaim would avail to defeat the sailors' right in the earned freights we will not now undertake to decide. The evidence is not in the record, and there are no findings of fact upon the questions indicated. We merely hold that there is a reasonable probability of earned freight which remains unpaid upon which the seamen may have an indirect lien. Admiralty Rule 45 (28 USCA § 723) permits the taking of additional testimony even after decree and on appeal. Sailors are indulged in courts of admiralty. Their error in supposing that their rights attached to the whole cargo rather than to the freight ought not to debar them from proving their true right when discovered before final de-

cree. Since the evidence can be taken more easily and cheaply at Tampa than before us, we shall direct that the case be reopened to ascertain what if any part of the proceeds of the several cargoes represents freight, and shall direct that the seamen have a first lien on such part for their wages.

The tug furnishes power and pilotage to the vessel, that she may earn her freight. Whether there is a lien for towage on the freight earned need not be decided, for all freight will be absorbed by the seamen's claims. The tug owner has, under 46 USCA § 971, a lien on the ship. There is ordinarily no lien on the cargo beyond the freight, for the tower is furnishing only what the ship is bound to furnish as consideration for the freight. There may be circumstances of necessity not giving rise to salvage which will raise a towage lien on the cargo, but they must be such as to empower the master to hypothecate the cargo and justify the tower in understanding that the cargo was intended to be thus burdened. The circumstances which will suffice for such hypothecation are discussed in The Julia Blake, 107 U. S. 418, 2 S. Ct. 692, 27 L. Ed. 595. In Re Alaska Fishing & Development Co. (D. C.) 167 F. 875, 879, an old barge of little value and with no motive power lay loaded with fish in an Alaska port with winter at hand. The master was unable to communicate with the owner of both barge and cargo. A tug's offer to tow was accepted without an express contract. The court said: "The owner being absent and the shipmaster under stress of necessity, a lien for necessaries attaches, by legal implication, without his formal express consent. [Citing cases as to lien on vessel.] * * * Under the circumstances stated, without an express agreement creating a lien, there is a legal presumption that the credit of the vessel and cargo was the inducement for the towage service, and there was an implied hypothecation of both, subject only to the paramount lien for mariner's wages." Since in that case the same person owned barge and cargo, no question of sacrificing the cargo to the ship existed. The lien allowed upon the cargo plainly was rested upon the existence of a necessity which authorized the master to hypothecate vessel and cargo, and justified a presumption that he had done so. Knapp Stout & Co. v. McCaffrey, 177 U. S. 638, 20 S. Ct. 824, 44 L. Ed. 921, is not authority for a maritime lien for towage upon cargo. The appeal was from the Supreme Court of Illinois, 178 Ill. 107, 52 N. E. 898, 69 Am. St. Rep. 290, where enforcement in equity was allowed of a common law bailee's lien which it was held existed under the law of Illinois for towing a raft of lumber. The Supreme Court of the United States deferred to the opinion of the Illinois court that there was a possessory lien under the local law, and held that the enforcement of it was no invasion of the admiralty jurisdiction. In the recent case of William Stevens v. The White City, 52 S. Ct. 347, 76 L. Ed. ——, it was held that the ordinary contract of towage is not a bailment, and does not put the tower in possession of vessel or cargo. The circumstances of the case at bar show no express or implied hypothecation of the cargo by the master, for the contract of towage was not made with him or at Grand Cayman, but with the owner of the ship at Tampa and without effort by anyone to communicate with the owners of the cargo. While the apples and meat were perishable, there is no finding that they were in imminent peril or that the credit of the ship was insufficient to enable her to obtain the help necessary to complete her contracts of carriage. It rather appears that without any hypothecation of cargo credit was given the ship and her owner, and that the object was not so much to save the cargo from perishing as to enable the ship to earn her freights. The circumstances do not warrant an implication of an hypothecation of the cargo for the towage. Compare The Eugene Vesta (D. C.) 28 F. 762.

Tampa Union Terminal Company for stevedoring and wharfage would appear to have a maritime lien on the vessel, 46 USCA § 971, and on the freights, The Velox (D. C.) 21 F. 479; but the proceeds of vessel and freights are absorbed by the prior lien thereon of the seamen. There is, however, a lien for storage and attendant services upon each item of the cargo under the laws of Florida. Comp. Gen. Laws Fla. 1927, § 6996. Though this is not a maritime lien, the admiralty court has jurisdiction over the cargo by reason of the maritime liens on it, and having by sale transferred all liens to the proceeds, which are a fund to be disbursed, it will recognize and pay all proper claims against the fund. Admiralty Rule 42 (28 USCA § 723); The Lottawanna, 21 Wall. 559, 582, 22 L. Ed. 654. The warehouseman's possessory lien was not removed by the seizure in admiralty but will be given due effect by the admiralty court. The B. F. Woolsey (D. C.) 7 F. 108; The Two Marys (D. C.) 10 F. 919. The lien

might have been asserted by a claim, or, as was done, by an intervention praying payment. The Two Marys (D. C.) 12 F. 152. Aside from the storage contract and the statutory lien, the court may award reasonable compensation for the protection of the cargo since seizure, and give it preference. New York Dock Co. v. The Poznan, 274 U. S. 117, 47 S. Ct. 482, 71 L. Ed. 955. Whether this was done in awarding costs we cannot determine from the record.

We therefore hold that proper freight and storage charges ought to be fixed on the proceeds of each consignment of the cargo. Storage since the seizure ought to be first paid, if not already paid, to Tampa Union Terminal Company. Freights, if any are found to be due, are next to be applied to the seamen's wages, which will exhaust the freights. The proceeds of each consignment are to be next applied to storage and attendant charges on it prior to seizure which are a lien under the Florida statute. If there shall be any surplus from any consignment, it belongs to the consignee unless an abandonment to the ship shall be found, in which case it should be treated as earnings of the voyage and applied to the wage claims. The decree appealed from is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.