John R. PETERSON et al., Appellants,

v.

S.S. WAHCONDAH and Ahern Shipping Company, Ltd. and Miami Marine Agency, Inc., Appellees.

No. 20684.

United States Court of Appeals
Fifth Circuit.

April 8, 1964.

Fernand F. Willoz, III, New Orleans, La., for appellants.

Samuel C. Gainsburgh, Theodore J. Pfister, Jr., New Orleans, La., Kierr & Gainsburgh, New Orleans, La., for appellee.

Before RIVES, JONES and WISDOM, Circuit Judges.

RIVES, Circuit Judge:

Except for the Master of the vessel, who is not a party to these proceedings, the libelants, appellants, are all of the officers and crew of the "SS WAHCONDAH" at the time of its arrival at the Port of New Orleans with a cargo of two thousand long tons of bulk sugar on or about June 18, 1962. The libelants' wages had last been paid on approximately May 1, 1962. After their arrival in New Orleans, and about two weeks after the sugar had been discharged from the vessel, the libelants demanded of the Master that they be paid the wages due them as of that time,[1] but the Master had had no money with which to pay them.

The vessel was of Canadian registry, and two of the libelants were Canadian citizens. The others came from the West Indies, from Latin America, and from as far away as Bombay, India. The ship remained at anchor in the Port of New Orleans until after September 19, 1962. No wages were paid the libelants, and they were without funds to repatriate themselves. Because of their status as unauthorized aliens, they could not attempt to find employment ashore. After remaining aboard the vessel for approximately three months, the supplies and provisions had been consumed and they sought the advice of counsel. On September 19, 1962, a libel was filed seeking their back wages, future wages that might be required of them while the ship was in the custody of the court, repatriation expenses, and penalty wages provided by 46 U.S.C.A. § 596.[2]

On the day after this libel was filed, the district court was apprised of the fact that libelants were still aboard the vessel, and that they were in desperate circumstances, having neither food nor water, nor the means of obtaining these necessities of life. The district court entered an order recognizing the claim of a local ship chandler for provisions furnished subsequent to the seizure of the vessel as a priority claim, on the basis of which libelants were able to obtain provisions on credit. On four later occasions, the lower court signed similar orders authorizing the purchase of additional provisions.

The vessel was owned by Ahern Shipping Company, Ltd., a Canadian corporation. On December 13, 1961, at Miami, Florida, Ahern had entered into a "Special Agency Agreement" with Miami Marine Agency, Inc. The agreement recited that Ahern "herewith and herein advises and notifies the Agent that it is in a precarious financial position and cannot obligate itself to advance any monies for expenses for the operation of the Vessel

---

1. 46 U.S.C.A. § 597 provides in pertinent part:

"Every seaman on a vessel of the United States shall be entitled to receive on demand from the master of the vessel to which he belongs one-half part of the balance of his wages earned and remaining unpaid at the time when such demand is made at every port where such vessel, after the voyage has been commenced, shall load or deliver cargo before the voyage is ended, and all stipulations in the contract to the contrary shall be void * * *."

2. In pertinent part:

"The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens * * *. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court * * *."

nor to repay any such advances or costs for the operation of the Vessel, but that all such advances, payments, etc. shall be made against the credit of the Vessel * * *." It authorized Miami "to collect freights in behalf of Owners and apply such funds to disbursements of the Vessel, including the purchase of supplies for the Vessel, and to advance funds in excess of those collected from freights as necessary to keep the Vessel in operation * * *." Miami intervened in the proceedings, asserting a lien against the vessel for advances between the dates of December 13, 1961 and May 31, 1962 in the amount of $15,530.03.

Under orders of the district court, the ship was finally sold to Miami for $20,100.00 and the sale confirmed by the court on November 21, 1962. On the same day the district court ordered that the sum of $10,187.94 from the amount on deposit as the proceeds from the sale of the vessel be distributed among the libelants, and in its order specifically recognized and reserved the rights of the libelants "to claim further distribution for wages through confirmation of the sale of the said vessel, repatriation expenses, statutory penalties, court costs, and legal interest out of the remainder of the proceeds of the sale of the 'SS WAHCONDAH'."

Also on that same day, the district court entered a default judgment in favor of the libelants against the vessel for the amount of the wages of the libelants through September 19, 1962, "specifically reserving to libellants and intervening libellants their rights to claim statutory penalties, wages due subsequent to the seizure of the vessel, and repatriation expenses upon proper motions filed."

On January 17, 1963, the libelants, along with J. B. Delaney Company and Lamendola Ship Chandler, moved the district court to distribute $8,769.61 of the remaining proceeds of sale as follows:

Officers and Crew:
    a/c Wages while the vessel was in *custodia*
         *legis* ................................$3,482.94
    a/c Repatriation Expenses ..................  920.85

                                                               $4,403.79

J. B. Delaney Co.:
    a/c Fuel and Provisions ....................$2,449.02
    a/c Attorney's Fees ........................  500.00

                                                                $2,949.02

Court Costs due Officers and Crew .......................  59.69
Lamendola Ship Chandler ...............................  910.11
Matthew Basic for Advance to the Ship ...................  447.00

                TOTAL ........................$8,769.61

Miami opposed this motion in two respects: (1) It denied that the officers and crew were entitled to wages while the vessel was in *custodia legis,* and (2) it questioned the right of the Court to allow any attorney's fee to the J. B. Delaney Company. Miami also requested additional time properly to prepare to oppose the motion, and the court postponed the hearing on the motion until February 6, 1963. On that day the court entered a default decree against the vessel, then represented by her proceeds of sale, in the amount claimed for advances by Miami, $15,530.03.

In a supplemental memorandum in support of their motion to distribute, the libelants undertook to reserve their claim

for penalties in the event the court should rule that they are not entitled to the payment of wages for the period while the ship was in the custody of the court.[3]

On April 30, 1963, the district court ruled with Miami in the two respects in which it had opposed the motion for distribution, and concluded that "the balance of the proceeds of the sale must be paid to intervenor, Miami Marine Service." On May 6, 1963, the libelants moved for a rehearing, asserting as one of the grounds that,

"The Court erred in failing to make any disposition whatsoever in the said opinion and order to the claims of the officers and crew for penalty wages that are due to them under 46 USCA 596, which penalties were originally claimed by the officers and crew in the libels and intervening libels filed herein, and their claims preserved in all of the pleadings and legal memorandum filed in this proceeding, in the event that this Court should find that they were not entitled to collect wages for their services subsequent to the seizure of the said vessel."

In a memorandum in support of their motion for rehearing, the libelants sought to assert their lien for wages and penalties on the earned freight.[4]

---

3. "It should also be considered that the crew has asked for penalty wages in the amount of twice the wages due them under the provisions of 46 U.S.Code 596 and that the testimony of the master taken herein on November 7, 1962 substantiates their claim to the penalties. The crew, however, has chosen not to press their claim for penalties, in view of the small amount that remains in the registry of the court, so that all claimaints (sic) against the proceeds might receive some payment for their efforts. However, should the court decide that they are not entitled to the payment of wages for the period while the ship was in the custody of the court, the officers and crew reserve all rights they have to claim these penalties, which the law and equity demand be paid to these unfortunate men who have suffered virtual imprisonment for a period of approximately six months while they were trapped aboard the 'SS WAHCONDAH' without funds, and without any means of returning to their native lands. It is further submitted that these men, as wards of the admiralty, are entitled to the highest consideration by the court, as the law wisely recognizes that because of the very nature of their work they are extremely vulnerable to injury."

4. "It will most probably be urged by counsel for Miami Marine Agency, Inc., that the crew is not entitled to double wages under the statute because the owners of the vessel were in bankruptcy at the time the ship reached New Orleans, and that it therefore is apparent that they were without means to pay the crew's wages and therefore should not be subjected to the penalty imposed by 46 USCA 596. However, the Master testified that the vessel delivered a cargo of sugar to the New Orleans area on its last voyage, and although he could not testify as to the exact amount of freight that was paid for transporting this sugar, the fact that the sugar was delivered is sufficient to give rise of a presumption that freight was paid. Counsel for the officers and crew has just been furnished with copies of letters from Dalton Steamship Corporation, which was then acting as the local agent for the 'SS WACONDAH' (sic), which said letters indicate that the freight due the operators of the 'SS WACONDAH' (sic) for delivering sugar to Colonial Sugars, Inc., Gramercy, Louisiana, on June 20, 1962 amounted to the sum of $11,274.-92. Proctor for the crew also has just been furnished with a copy of a letter from Colonial Sugars Company indicating that on June 29, 1962 they issued their check # 4200 in the sum of $5,-637.46 covering a partial payment of the freight due for delivering the sugar. As of that date, the back wages then earned by the officers and crew of the 'SS WACONDAH' (sic) were substantially less than the total amount of this partial freight payment.

"Under these circumstances, it is submitted that there were ample funds on hand with which to pay the crews wages; that these wages were entitled to the highest priority and should have been paid first, before anyone else; but that the operators of the 'SS WACONDAH' (sic) for reasons better known only to themselves arbitrarily refused to pay the crew the wages that were due them and that accordingly, 46 USCA 596 should be applied in awarding them double wages."

On appeal the libelants urge a single error, viz: "The district court erred in refusing to consider appellant's (sic) claim for statutory penalties due them under the provisions of 46 USCA 596." The libelants also ask for permission to take testimony to establish that an amount in excess of the wages due them was paid on the order of Miami for freight due the ship for the cargo of raw sugar delivered to New Orleans, and, hence, that there was no sufficient cause for failing to pay their wages.

■ It is well settled that the earned freight is subject to the seaman's maritime lien for wages. Clifford v. Merritt-Chapman & Scott Corporation, 5 Cir. 1932, 57 F.2d 1021, 1024 (per Sibley, Circuit Judge); 1 Benedict on Admiralty (6th ed.) sec. 80, p. 249.

In Collie v. Fergusson, 1930, 281 U.S. 52, 54, 50 S.Ct. 189, 196, 74 L.Ed. 696, Mr. Justice Stone collected the cases holding that, "The claim for double wages which, when valid, is by the terms of the statute 'recoverable as wages,' has been held to be embraced in the seaman's lien for wages, with priority over other liens, and governed by the procedure applicable to suits for the recovery of seaman's wages."

In that case, it was further said:

"But the increased payment for waiting time is not denominated wages by the statute, and the direction that it shall be recovered as wages does not purport to affect the condition prerequisite to its accrual that refusal or neglect to pay shall be without sufficient cause. The phrase 'without sufficient cause' must be taken to embrace something more than valid defenses to the claim for wages. Otherwise, it would have added nothing to the statute. In determining what other causes are sufficient, the phrase is to be interpreted in the light of the evident purpose of the section to secure prompt payment of seamen's wages (H.R.Rep. 1657, Committee on the Merchant Marine and Fisheries, 55th Cong., 2nd Sess.), and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed.

"The words 'refuses or neglects to make payment * * * without sufficient cause' connote, either conduct which is in some sense arbitrary or willful, or at least a failure not attributable to impossibility of payment. We think the use of this language indicates a purpose to protect seamen from delayed payments of wages by the imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages, and to induce prompt payment when payment is possible. Hence we conclude that the liability is not imposed regardless of the fault of the master or owner, or his retention of any interest in the vessel from which payment could be made. It can afford no such protection and exert no effective coercive force where delay in payment, as here, is due to the insolvency of the owner and the arrest of the vessel, subject to accrued claims beyond its value. Together these obstacles to payment of wages must be taken to be a sufficient cause to relieve from the statutory liability." 281 U.S. at pp. 55–56, 50 S.Ct. at pp. 191, 74 L.Ed. 696.

See also McCrea v. United States, 1935, 294 U.S. 23, 29, 30, 55 S.Ct. 443, 79 L.Ed. 933.

■ Miami urges that the libelants waived any claims which they may have had under the provisions of 46 U.S.C.A. § 596. The test of waiver is contained in this court's definition in Watkins v. Fly, 5 Cir. 1943, 136 F.2d 578, 580: "A waiver may be defined as the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it."

■ The penalties due under 46 U.S. C.A. § 596 were consistently claimed by

the libelants, and reserved to them by the orders of the district court until the last motion to distribute, and then the libelants made known that they desired to reserve their claim for penalties in the event the district court ruled that they are not entitled to wages while the ship was in *custodia legis*. See note 3, supra. There was never any such intention to relinquish their right to penalties as would amount to a waiver by libelants of any claims which they may have under 46 U.S.C.A. § 596.

The district court erred in refusing to rule upon the libelants' claim for statutory penalties which may have been due them under the provisions of 46 U.S.C.A. § 596. The judgment is therefore reversed and the cause remanded for the taking of additional relevant testimony, and for further proceedings consistent with this opinion.

Reversed and remanded.